# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
May 17, 2005 Session

## STATE OF TENNESSEE v. DEBRA ELAINE KIRK

**Direct Appeal from the Criminal Court for Cocke County**
**No. 9080     Ben W. Hooper, II, Judge**

---

**No. E2004-01263-CCA-R3-CD - Filed September 30, 2005**

---

Defendant, Debra Elaine Kirk was indicted on one count of aggravated child abuse and one count of felony murder. Following a jury trial, Defendant was convicted of aggravated child abuse of a child less than six years old, a Class A felony, and criminally negligent homicide, a Class E felony, and lesser included offense of felony murder. Following a sentencing hearing, the trial court sentenced Defendant as a Range I standard offender to twenty-five years for the aggravated child abuse conviction and two years for the criminally negligent homicide conviction. The trial court ordered Defendant to serve her sentences concurrently. In this appeal, Defendant argues (1) that the length of sentence imposed for her aggravated child abuse conviction violated the principles set forth in the recent United States Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004); (2) that the trial court erred in denying Defendant's motion to suppress her statement and in allowing Defendant's statement to be introduced into evidence; (3) that the trial court erred in allowing the admission of evidence of Defendant's prior drug use; (4) that the trial court erred in allowing Dr. Darinka Mileusnic to testify about certain toxicology test results; and (5) that the jury's verdicts were inconsistent. Because we determine that reversible error occurred in the trial court's admission of evidence at trial of Defendant's prior drug use, we reverse the judgments of the trial court and remand for a new trial.

### Tenn. R. App. P. 3 Appeal as of Right;
### Judgments of the Criminal Court Reversed and Remanded

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Edward Cantrell Miller, District Public Defender, and Keith A. Haas, Assistant Public Defender, Newport, Tennessee (at trial), for the appellant, Debra Elaine Kirk.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Al Schmutzer, Jr., District Attorney General; James Bruce Dunn, Assistant District Attorney, for the appellee, the State of Tennessee.

**OPINION**

**I. Background**

Wayne Trentham, a paramedic for Cocke County, testified that he responded to a 911 call on July 22, 2002. As the ambulance approached the residence where the call originated at approximately 9:43 a.m., a man, later identified as Defendant's husband, Lacie Kirk, II, ran out of the house carrying a baby in his arms. The baby was Lacie Kirk, III, the four-month old son of Mr. Kirk and Defendant. Mr. Kirk handed the victim to Mr. Trentham and told him the victim was not breathing. Mr. Trentham performed mouth-to-mouth resuscitation on the victim and then switched to an infant bag for ventilation. Mr. Trentham said that the victim did not have a pulse, but he was still warm to the touch with no sign of rigor mortis. The ambulance arrived at the Cocke County Baptist Hospital at 10:17 a.m.

Derrick Woods, a detective with the Cocke County Sheriff's Department, said that he was present at the Cocke County Baptist Hospital when the ambulance arrived with the victim. The victim was transferred to the Johnson City Medical Center. Detective Woods said that he read Defendant her Miranda warnings at the medical center, and Defendant told him that she did not know what happened to her son. The victim died on July 24, 2002.

Detective Woods said that he and Detective David Slagle interviewed Defendant again on March 6, 2003, beginning at 10:52 a.m. Detective Woods read Defendant her Miranda rights. Defendant indicated that she understood her rights and executed a written waiver. In her first statement, Defendant admitted that she had used cocaine during the three days prior to July 22, 2002, but she denied that she gave the victim any drugs, specifically Oxycontin. Defendant said that she bought $30 worth of Oxycontin from her brother-in-law during the early morning hours of July 22, 2002 to help her sleep. She later woke up when her husband yelled at her to call 911 because the victim was not breathing.

Detective Woods said that he finished recording Defendant's first statement at 3:11 p.m., and they took a break until 4:39 p.m. Detective Woods said that before the questioning resumed, he again read Defendant her Miranda rights, and Defendant signed a second waiver of those rights. During the course of this interview, Defendant admitted that she had given the victim Oxycontin.

Defendant's statement was read to the jury. Defendant stated that she bought some Oxycontin pills from Billy Farmer, her brother-in-law, in the early morning hours of July 22, 2002. Her husband crushed the pills into dust and crumbs on top of the washing machine on two different occasions. After the second occasion, the victim woke up. In her written statement, Defendant described the next events as follows:

> [T]he baby had spit it's [sic] [pacifier] out. I tried to put it back in. I tried bouncing
> him, walking him around, patting him on his back but he would not go back to sleep.
> I then took his [pacifier] into the bathroom, where the Oxycontin was crushed. The

dust was crumbs, not much there to even snort a line. The [pacifier] was wet from the baby. I stuck [it] in the dust and crumbs, then put the [pacifier] back into the babies [sic] mouth. Lacie was in [the] kitchen making a bottle, while the baby was laying on its pallet after I give it [sic] the [pacifier] with the [pacifier] having a light powder on it where I stuck it in the Oxycontin on the washing machine. By the time Lacie got done making his bottle, the baby was already asleep. I was patting his back laying beside him. Then Lacie came to bed on the floor and got between me and the baby. Then we all went to sleep. I woke up the following morning. Lacie was screaming call 911, that the baby [was not] breathing. That's when I call[ed] 911. Lacie was trying to get the baby breathing, and he would not breath. Then the ambulance came. This is the truth and what actually happened. I did not hurt my baby on purpose. I have never give [sic] any of my kids drugs before. I have never seen Lacie or has he told me he has [given] my children anything. The whole time I was pregnant I used Oxycontin, when pregnant with Lacie the third. I am addicted [to] Oxycontin. I would say I'm addicted to cocaine. I prefer Oxycontin over cocaine.

On cross-examination, Detective Woods said that he finished recording Defendant's statement at 8:44 p.m. He said that Defendant did not begin to change her previous statement until between 7:00 p.m. and 7:30 p.m. Detective Woods said that Defendant asked to call her mother during the first interview so that her mother could contact an attorney. Detective Woods told Defendant that she could not call her mother, but that she could call an attorney.

Detective Woods said that they took an hour and half break after Defendant asked permission to call her mother. Detective Woods said that he was personally acquainted with Defendant and her family. He acknowledged that he told Defendant on one occasion that if she wanted his help, Defendant would have to tell the truth. Detective Woods said that Defendant changed her story at some point after he made that statement.

Detective Woods said that he investigated the residence of Billy and Elizabeth Farmer, where the Kirks were staying on the night of the offense. He did not retrieve the victim's pacifier on July 22 or July 23, 2002. Detective Woods said that Mr. Kirk, in his July 22, 2002 statement, said that he woke up to find the victim laying with his face on a piece of plastic. Detective Woods said that the Farmer's living room had been cleaned by the time he visited their home, and he did not see any plastic bags.

Darinka Mileusnic, a forensic pathologist with the Knox County Medical Examiners Office, said that she performed an autopsy on the victim on July 25, 2002. Dr. Mileusnic said that the victim weighed 12.5 pounds at death and that the victim was well developed considering the fact that he had been born prematurely.

Dr. Mileusnic testified that the autopsy revealed severe changes in the victim's brain and kidneys which appeared to be caused by a toxic substance. Whatever toxic substance was in the

victim's system, however, had dissipated while he was hospitalized, and Dr. Mileusnic was unable to detect toxic substances in either the victim's body fluids or his tissues.

Dr. Mileusnic requested a sample of the victim's blood which had been drawn upon his arrival at the hospital in order to get a more accurate reflection of what was in the victim's system at the time he was discovered to be unresponsive. Dr. Mileusnic said that the victim's cause of death was initially listed as "undetermined" pending the development of further information. Dr. Mileusnic stated that the changes in the victim's brain and kidneys, however, did eliminate sudden infant's death syndrome as a cause of death.

Dr. Mileusnic forwarded the sample of the victim's blood for testing to Dr. Christopher Long, a chemist with St. Louis University Forensic Toxicology. The first test performed on the sample detected the presence of oxycodone in the victim's blood. Dr. Mileusnic said that Oxycontin was the registered name for oxycodone. The victim's blood sample, however, was insufficient to perform the second test usually performed when oxycodone is the suspected toxic substance. As a result, the overall test results reflected a "negative" finding for oxycodone. In a letter dated March 25, 2003, Dr. Long explained to Dr. Mileusnic that the second test did not detect oxycodone "most reasonably due to the dilution effect as [he] had very little sample to analyze." Dr. Long stated in his letter that "[i]f the drug does not meet acceptable criteria, then we must report it as negative." Dr. Long confirmed during a telephone conversation with Dr. Mileusnic that the first test showed the presence of oxycodone in the victim's blood.

Based on Dr. Long's finding of the presence of oxycodone in the victim's blood during the first test, the autopsy findings reflecting toxic renal and brain damage, and Defendant's confession, Dr. Mileusnic amended her autopsy report to reflect that the cause of the victim's death was oxycodone toxicity.

On cross-examination, Dr. Mileusnic said that effects of Oxycontin would be immediate on an infant like the victim. Dr. Mileusnic said that she did find edema fluid in the victim's lungs, but said that edema fluid was frequently present after hospitalization. Dr. Mileusnic said that Oxycontin could be passed on to a fetus if the drug is taken during pregnancy, but the drug would be dispersed throughout the fetus' body and would not cause the kidney damage observed in the victim.

The defense then presented its proof. Doris Smith, Defendant's grandmother, testified that a similar incident occurred when the victim was two months old. The victim was in Mr. Kirk's care while Defendant was at work. Ms. Smith drove up to Defendant's residence, and Mr. Kirk ran outside carrying the victim. Mr. Kirk told Ms. Smith the baby was not breathing, and Ms. Smith called 911. The baby was breathing, however when the paramedics arrived. On cross-examination, Ms. Smith admitted that she told Detective Woods that Defendant used Oxycontin.

Defendant testified that the victim was born on March 18, 2002, but was not discharged from the hospital until April 11, 2002, because he was born prematurely. Defendant said that Mr. Kirk did not work, and she and Mr. Kirk were experiencing marital difficulties. Defendant said that she

left for work on July 22, 2002, around 3:00 p.m. Mr. Kirk, with the victim, picked her up when her shift ended at 1:00 a.m. Defendant said that they drove to the residence of Billy and Elizabeth Farmer. Mrs. Farmer was Mr. Kirk's sister. They decided to spend the night because it was so late. Mr. Kirk put some blankets and two pillows on the floor. Defendant said she fed the victim, and he went to sleep.

Mr. Kirk told Defendant to purchase some Oxycontin pills from Mr. Farmer. When Defendant returned, both she and Mr. Kirk ingested the drugs, and then went to sleep. Defendant said she woke up the next morning when Mr. Kirk yelled for her to call 911 because the victim was not breathing. Defendant called 911 while Mr. Kirk attempted to resuscitate the victim. Defendant wanted to ride to the hospital in the ambulance, but the paramedics would not let her. Defendant said that she did not give any drugs to the victim, but she did not know if Mr. Kirk did.

Defendant said she told Detective Woods during the interview on March 6, 2003, that she wanted to call her mother so that her mother could contact an attorney. She said that Detective Woods told her she could make the telephone call "as soon as he was done." Defendant said, however, that Detective Woods did not give her the opportunity to use the telephone during their break. Defendant said that she knew and trusted Detective Woods. Defendant said that she only told Detective Woods that she had given the victim Oxycontin because he told her that he would see that the charges were dropped or reduced if she admitted that she had done so.

On cross-examination, Defendant said that her first statement on March 6, 2002, was true, not her second statement. She said that she used Oxycontin to help if her sleep or to "hype" herself up if she was not tired, and she admitted that she used Oxycontin in the early morning hours of July 22, 2002. Defendant admitted that she laughed after giving her second statement, but she said that she did not know that the interview was being videotaped.

## II. Motion to Suppress

Defendant argues that the trial court erred in denying her motion to suppress her statement to Detectives Wood and Slagle. Defendant contends that the investigating detectives failed to cease questioning her after she made an unequivocal request for an attorney, and that her statement was the result of the detectives' coercive tactics which overcame her will to resist.

At the suppression hearing, Detective Slagle testified that he videotaped Defendant's interview. He was not aware, however, that the tape had run out on several occasions, and there were portions of the interview that were not preserved on tape, including Defendant's request to call her mother. Defendant was read her Miranda rights and signed a written waiver before her first interview. The first interview with Defendant began at 10:52 a.m. and ended at 3:20 p.m. Defendant denied giving the victim drugs, and then agreed to take a polygraph test. They took a break from 3:20 p.m. to 4:30 p.m. Defendant was read her Miranda rights again, signed a second waiver form, and Detective Slagle administered the polygraph test. Detective Slagle scored the polygraph charts and told Defendant at approximately 6:00 p.m. that it appeared she had not been truthful in some of

her responses. Defendant asked to speak with Detective Woods alone at approximately 7:30 p.m. Detective Slagle rejoined the interview shortly thereafter, and Defendant admitted that she had given the victim Oxycontin on July 22, 2002.

Detective Woods testified that Defendant in her initial statement denied giving the victim drugs. Detective Woods asked Defendant if she wanted to take the polygraph test. Defendant asked if she could call her mother so that her mother could contact an attorney. Detective Woods told Defendant she could call an attorney, but not her mother. Defendant said that she wanted to take the polygraph test to prove she was telling the truth. Detective Woods said that he decided to take a break at this point. He resumed the interview in approximately ninety minutes. Detective Woods asked Defendant if she was sure she wanted to take the polygraph test. Defendant said that she did, and Detective Woods read the Miranda rights to her again. Detective Woods said that Defendant did not ask to use the telephone again.

Defendant testified that she was in custody for violation of probation at the time she gave her statement. Defendant said that she was returned to a holding cell while the detectives ate lunch, and the jailer would not let her use the telephone. Defendant said that she wanted to call her mother during the interview because she did not "know any attorneys in Cocke County that would represent somebody." Defendant said that she had never been in a situation before in which she needed an attorney. Defendant said that Detective Woods told her that she could use the telephone "in a little while," but never gave her the opportunity to do so. Defendant said that she did not remember that Detective Woods told her she could call an attorney.

Defendant said that she was held in the "drunk tank" for three days on suicide watch after the interview, and she was not allowed to use the telephone during this time. Defendant said that she was permitted to call her mother on the third day to tell her that she was all right.

On cross-examination, Defendant said that she had previously contacted David Hill, a local attorney, to represent her in a potential custody lawsuit. However, Defendant said that she never retained Mr. Hill to represent her. Defendant admitted that her mother visited her at jail during the three days following the interview.

At the conclusion of the suppression hearing, the trial court found that Defendant was less than credible during her testimony. The trial court found that Defendant asked to call her mother, not an attorney, and then withdrew her request to use the telephone because she wanted to go ahead and take the polygraph test. Based on the totality of the circumstances, the trial court found that there was no evidence that Defendant did not want to talk to the detectives, and no evidence of any oppression or force during the interview.

A. Standard of Review

At a suppression hearing, the State has the burden of demonstrating by a preponderance of the evidence that the defendant's statement was voluntary, knowing and intelligent. *State v. Kelly*,

-6-

603 S.W.2d 726, 728 (Tenn. 1980). A trial court's determination at a suppression hearing is presumptively correct, and the findings are binding on this Court unless the evidence in the record preponderates against them. *State v. Odom*, 928 S.W.2d 18, 22 (Tenn. 1996).

Matters regarding the credibility of witnesses, the weight and value to be afforded the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial court. *Id.*, 928 S.W.2d at 23. Thus, on appeal, the defendant has the burden of showing that the evidence preponderates against a finding that a confession was, in fact, knowingly and voluntarily given. *State v. Buck*, 670 S.W.2d 600, 610 (Tenn. 1984). In determining whether a statement is made voluntarily, this Court must look to the totality of the circumstances surrounding the confession, and the standard is whether "the behavior of the State's law enforcement officials was such as to overbear the [defendant's] will to resist and bring about confessions not freely determined." *Kelly*, 603 S.W.2d at 728.

### B. Request for an Attorney

Defendant argues that her statement should be suppressed because the interviewing detectives failed to cease questioning her after she made an unequivocal request for an attorney. Encompassed with the Fifth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution "is the right to counsel, which is applicable whenever a suspect requests that counsel be present during police-initiated custodial interrogation." *State v. Saylor*, 117 S.W.3d 239, 244 (Tenn. 2003). If a defendant makes an unequivocal request for counsel while being given his or her Miranda warning or during the custodial interrogation, the interrogation must cease until counsel is present. *Edwards v. Arizona*, 451 U.S. 477, 481-82, 101 S. Ct. 1880, 1883-84, 68 L. Ed. 2d 378 (1981); *Saylor*, 117 S.W.3d at 244. An invocation of the right to counsel, however, "'requires at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355, 129 L. Ed. 2d 362 (1994) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S. Ct. 2204, 2209, 115 L. Ed. 2d 158 (1991)). "If the suspect fails to make such an unambiguous statement, police may continue to question [the suspect] without clarifying any equivocal requests for counsel." *Saylor*, 117 S.W.3d at 246 (citing *State v. Huddleston*, 924 S.W.2d 666, 670 (Tenn. 1996)). Whether the defendant did or did not make an unequivocal request for counsel is a question of fact. *State v. Farmer*, 927 S.W.2d 582, 594 (Tenn. Crim. App. 1996).

Based upon the evidence presented at the evidentiary hearing, the trial court, accrediting the testimony of Detective Woods, found that Defendant neither invoked her Fifth Amendment right to counsel, nor was prevented from doing so. The trial court noted that although Defendant said that she did not know any attorneys whom she could call, Defendant had previously contacted an attorney about an unrelated matter. Defendant was read her Miranda rights twice, including her right to request counsel, and Defendant said that she understood and waived those rights. The trial court is in the best position to determine the credibility of witnesses, and great weight is attributed to the trial court's determination. *Saylor*, 117 S.W.3d at 577 (citing *Odom*, 928 S.W.2d at 23). Defendant is not entitled to relief on this issue.

## C. Force or Oppression

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U. S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Our Supreme Court has previously concluded that "the test of voluntariness for confessions under Article 1, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992).

Relying on *State v. Phillips*, 30 S.W.3d 372 (Tenn. Crim. App. 2000), Defendant argues that her statement was involuntarily given because of the coercive tactics of the investigating detectives. Specifically, Defendant contends that the interrogation lasted over eight hours, and she was given little to eat or drink during this time. Defendant argues that the detectives made repeated promises of leniency if she would tell them "the truth," despite her steadfast denial of wrongdoing.

"[I]n order for a confession to be admissible, it must be 'free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however, slight, nor by the exertion of any improper influence . . .'" *State v. Smith*, 933 S.W.2d at 455 (Tenn. 1996)(quoting *Bram v. United States*, 168 U.S. 532, 542-43, 18 S. Ct. 183, 187, 42 L. Ed. 2d 568 (1897)). In Tennessee,

> promises of leniency by state officers do not render subsequent confessions involuntary *per se*: 'The Fifth Amendment does not condemn all promise-induced admissions and confessions; it condemns only those which are *compelled* by promises of leniency.'" *Smith*, 933 S.W.2d at 455 (quoting [*State v.*] *Kelly*, 603 S.W.2d [726, 729 (Tenn. 1980)](quoting *Hunter v. Swenson*, 372 F. Supp. 287, 300-01 (D.C. Mo. 1974)(emphasis added)). The critical question is "'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self determined. . . .'" *Id*. at 728 (quoting *Rogers* [*v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 741, 5 L. Ed. 2d 760 (1961)).

*Smith*, 933 S.W.2d at 455-56.

In *Phillips*, this Court found that the line of questions employed by the investigators impermissibly "crossed the line" based on the presence in the record of "(1) misrepresentations by an investigator; (2) numerous steadfast denials by the defendant; (3) statements that law enforcement officials would be involved if defendant did not confess; and (4) promises of treatment for the defendant [who faced charges of sexual misconduct] and his stepdaughter only if he fully confessed." *Phillips*, 30 S.W.3d at 377.

First, we note that the defendant in *Phillips*, unlike the case *sub judice*, was in a non-custodial situation which did not require the provision of Miranda warnings when he made his statement. *See id.* at 376. Defendant does not factually dispute Detective Woods' testimony that Defendant was read her Miranda warning before the commencement of the first interview and again before she took the polygraph test, that she appeared to understand her rights, and that she executed written waivers of her Miranda rights on both occasions.

As to the environment surrounding the interview, Defendant said she woke up shortly before the first interview which started at 10:52 a.m. Although the entire interview process lasted until approximately 8:44 p.m., there was a ninety-minute break before Defendant took the polygraph test at 4:30 p.m. Detective Woods said that Defendant never asked to stop the interview. At some point, Detective Woods told Defendant that if she wanted his help, she would have to be truthful. Detective Woods said that he knew Defendant and her family, and they discussed various issues concerning Defendant's family at the end of the interview, and the two of them laughed over some of the topics. Based on our review of the record, we find that the evidence does not preponderate against the trial court's finding that Defendant was not coerced into making her statement. Defendant is not entitled to relief on this issue.

## III. Prior Bad Acts

Defendant argues that the trial court erred in admitting portions of Defendants' statements which referenced her use of cocaine during the three days immediately preceding the victim's death. Defendant contends such evidence was not relevant to any issue at trial and was highly prejudicial. Without being more specific, the State argues that Defendant's admissions that she used cocaine use was relevant and therefore admissible evidence.

Defendant gave three statements to the investigating officers concerning the sequence of events leading up to the victim's death, and all three statements were admitted into evidence. Defendant's first statement was made at the Johnson City Medical Center on July 22, 2002, before the victim died. Defendant told Detective Woods that her husband picked her up from work at 12:30 a.m. on July 22, 2002. The victim was asleep in his car seat. Defendant, Mr. Kirk, and the victim spent the night at the Farmer's residence. Defendant fed the victim and laid him down on a pallet on the floor. The victim fell asleep, and Defendant was awakened the next morning by Mr. Kirk's screams to call 911 because the victim was not breathing. Defendant did not mention using either cocaine or Oxycontin.

Defendant's second statement was given during the afternoon of March 6, 2003. This statement is a rambling, detailed six-page description of the sequence of events occurring between Thursday, July 19, 2002, and Sunday, July 22, 2002. Defendant and Mr. Kirk spent the three days essentially shopping, eating out, and using cocaine. The victim was staying with a babysitter for a portion of this time. During the remainder of the time, Defendant and Mr. Kirk used cocaine while the victim napped, or they took turns watching the baby and taking drugs. To give a flavor of

Defendant's statement, the following is her description of how she and Mr. Kirk spent Friday afternoon and night, after Defendant picked the victim up from the babysitter's house:

> We then went and ate at Family Farm Restaurant with the baby. [Mr. Kirk] wanted another eight ball [of] cocaine, so we went [and] found that same girl. We really both wanted the cocaine. . . . [Mr. Kirk] went [and used] cocaine while I stayed in my car. Then [Mr. Kirk] came back and I went [and used] cocaine while [Mr. Kirk] kept the baby. We went and got [a] motel room at Family Inn. . . . We stayed there for about an hour and done [sic] some cocaine and played with the baby. I told [Mr. Kirk] I wanted to go to Morristown and buy the baby some clothes. We went to [the] mall, then went to eat, then rode around [and] stopped at the Dollar Store and bought the baby some clothes and spoiled him. We headed back to Newport and went to [the] motel room. Me and [Mr. Kirk] done [sic] the rest of the cocaine while the baby was asleep on the bed. I decided, we decided, to get another ball [of] cocaine because Cindy came over to the motel. [Mr. Kirk] and Cindy were drinking beer. Lacie, the baby, was asleep on the bed. Me, [Mr. Kirk] and Cindy were doing the cocaine.

Defendant and Mr. Kirk continued using cocaine throughout the day on Saturday. Defendant also said that on Saturday afternoon, she bought one Oxycontin pill from Mr. Farmer which she crushed and ingested before going to work. Mr. Kirk and the victim picked Defendant up from work around 1:00 a.m. on Sunday. Defendant said that she fed the baby, and then bought one Oxycontin pill from Mr. Farmer because she was tired, and Oxycontin made her sleepy. Mr. Kirk crushed the pill up in the bathroom, and both of them "snorted" the drug. When she woke up the next morning, the victim was not breathing.

In her third statement, Defendant eliminated the description of her activities during the three days prior to Sunday, July 22, 2002. She did not mention using cocaine in this statement, except that she admitted that she "prefer[red] Oxycontin over cocaine."

Defense counsel filed two motions in limine prior to trial seeking to prevent the State from introducing into evidence "any reference of mention of the Defendant's first child, Adrianna, and/or her manner of death," and "evidence of the Defendant's prior bad acts, conduct, character or reputation."

The State offered the first statement Defendant made on March 6, 2002, as an exhibit during Detective Woods' direct examination. Defense counsel objected, and, during a hearing out of the presence of the jury, asked the trial court to redact any references in the statement to the previous death of Defendant's older daughter. In her second statement, Defendant explained that she and Mr. Kirk picked up a settlement check in the amount of $55,000.00 from their insurance company on Thursday, July 19, 2002. The check was issued in response to a claim the Kirks filed as a result of the drowning death of their oldest child, Adrianna, a few months before the victim's death. The

references to Defendant's older child and the insurance proceeds in Defendant's statement were redacted prior to introduction.

The State continued with its direct examination as follows:

[THE STATE]:          I forget exactly where I was but the question is, did [Defendant] admit to you to snorting cocaine?

[DETECTIVE WOODS]:    Yes, sir.

[THE STATE]:          Was it on more than one occasion?

Defense counsel interposed an objection, and the trial court conducted a bench conference outside the hearing, but within the presence, of the jury.

[DEFENSE COUNSEL]:    In the [second] statement she talks about cocaine, and in the [third] she talks about Oxycontin, that's the only thing I'm trying to point out.

[THE STATE]:          One of them's got to be known. It's not both of them, but one of them's got to be heard. I'm not trying to make her out to be a dope addict, but I mean that's what she told the officer.

[DEFENSE COUNSEL]:    What they're trying to put into this statement is things that she did prior to the day in question.

[THE COURT]:          *If this were some piece of evidence outside of the statement I would sustain the objection, but the fact that it's an admission on her part . . . I'm going to overrule the objection that it's . . . It's just simply a part of her admission and, of course, it's not going to make a whole lot of difference whether it was cocaine of Oxycontin. I mean, you know, it kind of clears the air I guess as to what they were doing.* (emphasis added).

[DEFENSE COUNSEL]:    Part of the objection was that this was done before the child was actually found not to be breathing, it was not the day in question.

[THE STATE]:          It's still her statement, her admission.

| | |
|---|---|
| [THE COURT]: | I'm not sure that there's . . . My thinking is that it is in her admission as to part of her statement, that it's not some outside piece of evidence and then for that reason it is admissible. But why don't you go ahead and clear it up that it was a couple of days before. |

Detective Woods' direct examination was resumed, and the State asked, "And did the defendant tell you that she had used cocaine a couple of days prior to the 22nd."

| | |
|---|---|
| [THE COURT]: | Let me interrupt at this point and maybe tell the jury, that admission was in the statement that she gave *but the evidence certainly is somewhat removed from the real issue in this case*. This defendant shouldn't be convicted because she used cocaine two days earlier, I guess is the simplest way for me to put it. It's there and for that reason I've let it in, but I don't want you to give any undue weight to that. And you may continue. (emphasis added). |

It appears that the trial court concluded that Defendant's numerous admissions of cocaine use were admissible because they were contained within her second statement which itself was admissible under Rule 803(1.2) of the Tennessee Rules of Evidence. The trial court, therefore, did not follow the statutory procedures governing the admission of evidence of other prior bad acts set forth in Rule 404(b) of the Tennessee Rules of Evidence. Nor did the trial court, other than a comment that the admission "clears the air," rule on the relevancy of the proffered evidence.

Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." In order for such evidence to be admitted, Rule 404(b) requires that the following procedures occur:

(1) The court upon request must hold a hearing outside the jury's presence.

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record, the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). "Evidence of a criminal defendant's character may become admissible when it logically tends to prove material issues which fall into one of three categories: (1) the use of 'motive and common scheme or plan' to establish identity; (2) to establish the defendant's intent in committing the offense at trial; and (3) to 'rebut a claim of mistake or accident if asserted as a defense." *State v. Thacker*, 164 S.W.3d 208, 239-240 (Tenn. 2005) (quoting *State v. McCary*, 922 S.W.2d511, 514 (Tenn. 1996)).

Defendant's admission to Detective Woods that she used cocaine during the weekend constitutes evidence of another crime subject to Rule 404(b) scrutiny. *See State v. Louellen*, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). The fact that the prior bad acts evidence is contained within a defendant's statement to the police concerning the offense at trial does not relieve the trial court of the duty to conduct a Rule 404(b) hearing to determine the admissibility of the admissions. *See, e.g., Thacker*, 164 S.W.3d at 238-241 (Conducting a Rule 404(b) analysis in light of the defendant's references to other crimes in his statement to the police concerning the current charges.)

A trial court's decision to admit evidence based upon relevancy under Rules 401 and 402 of the Tennessee Rules of Evidence will not be disturbed on appeal absent an abuse of discretion. *State v. Gilliland*, 22 S.W.3d 266, 277 (Tenn. 2000). If the relevancy of the proffered evidence is subject to analysis under Rule 404(b), however, our standard of review is based on an abuse of discretion only if the trial court substantially complies with the rule's procedural requirements. *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997). It appears that the trial court in the instant case did not consider the admissibility of Defendant's admission of using cocaine as a Rule 404(b) issue, and thus did not follow any of the rule's procedural requirements. If a trial court does not substantially comply with the procedural requirements of Rule 404(b), then no deference is given to the trial court's decision. *Id*.

The State offers no indication in its brief as to how Defendant's use of cocaine prior to the date of the offense was relevant to a litigated issue other than to show Defendant's character. Defendant did not dispute at trial that she used Oxycontin and cocaine, or that she used the drugs while the victim was under her care. At trial, Defendant admitted that she bought and used Oxycontin during the early morning hours of July 22, 2002 while the victim was in the house. Defendant denied, however, that she gave the victim Oxycontin, and thus did not attempt to explain or mitigate her responsibility by claiming that the victim's ingestion of Oxycontin was an accident or mistake. Defendant's defense was based on the contention that Mr. Kirk had given Oxycontin to the victim. Furthermore, the trial court acknowledged, in its instruction to the jury, that the evidence was "somewhat removed from the real issue in this case."

"The general rule excluding evidence of other crimes is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense at trial. Such a potential particularly exists when the conduct or acts are similar to the crime at trial." *State v. Richardson*, 876 S.W.2d 824, 828 (Tenn. Crim. App. 1994)(citations omitted).

Defendant's references to cocaine use on Thursday and Friday could have easily been redacted from Defendant's statement. To say that Defendant's lifestyle was "unwholesome" or her parenting skills questionable "would be excessively charitable." *See State v. Bordis*, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995). However, "a jury cannot be allowed to convict a defendant for bad character or any particular 'disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." *Id.* (quoting *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994)). We fail to discern how Defendant's admission that she used cocaine in the days prior to the victim falling ill was relevant to a material issue at trial. Based on the foregoing, we conclude that the trial court erred in admitting the evidence of Defendant's use of cocaine during the two days prior to the commission of the offense, and, under the facts of this case, the error was not harmless. Accordingly, we reverse Defendant's convictions for criminally negligent homicide and aggravated child abuse.

In the event of further review, and for guidance in the event of a new trial, we will address Defendant's remaining issues.

## IV. Expert Testimony

Defendant argued that the trial court erred in allowing Dr. Mileusnic to give her opinion in the area of toxicology when she was only qualified as an expert in the area of forensic pathology. Initially, we note that Defendant does not cite any authority in support of his contention that Dr. Mileusnic was permitted to testify outside her field of expertise. "Issues which are not supported by argument, citation to authorities or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); *see also* Tenn. R. App. P. 27(a)(7). Nonetheless, we will consider the merits of Defendant's issue.

It is well established that "questions concerning the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). A witness who is qualified as an expert in a particular field may testify in the form of an opinion if the scientific, technical or other specialized knowledge of the witness will substantially assist the trier of fact in understanding evidence or determining a fact at issue. Tenn. R. Evid. 702; *see McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). In addition, the evidence offered through the expert must be relevant to a fact at issue in the case. Tenn. R. Evid. 401, 402. A trial court's ruling will not be overturned on appeal unless the reviewing court finds that the trial court abused its discretion in admitting or excluding the expert testimony. *Stevens*, 78 S.W.3d at 832.

Dr. Mileusnic testified that although she sent the victim's blood sample to another laboratory for testing, she was trained in toxicology, and it was her job to synthesize the results and form an opinion of the relationship between the results and the autopsy findings. Dr. Long's report was introduced as an exhibit in which he explained that he could not report a positive finding for Oxycontin because, although the first part of the test tested positive for the drug, the second part of the test could not be performed. As a result, laboratory protocol required a negative finding. Dr.

Long stated in his report that the inability to perform the second part of the test was "most reasonably due to the dilution effect as we had very little sample to analyze."

Dr. Mileusnic testified,

Well, I'm a pathologist who knows that one toxicology test is positive and I have changes in the tissues in the baby. I have kidneys [which] show severe damage. I have [a] brain that shows severe damage. And I have one toxicology report test positive. For me that's enough. I don't need both toxicology tests positive. I need one toxicology positive and I need changes in the tissue.

A medical examiner may testify as to the cause of the victim's death. *See State v. Bragan*, 920 S.W.2d 227, 245 (Tenn. Crim. App. 1995). An expert may base his or her opinion on "(1) information actually perceived by the expert; (2) information made known to the expert by others; and (3) information reasonably relied upon by experts in the particular field." *State v. Kennedy*, 7 S.W.3d 58, 66 (Tenn. Crim. App. 1999) (citing Tenn. R. Evid. 703). Dr. Mileusnic's experience and medical training qualified her to testify as to the cause of the victim's death. The fact that Dr. Long was unable to perform a corroborating test for the presence of Oxycontin in the victim's blood sample goes to the weight of the evidence presented. Defendant is not entitled to relief on this issue.

## V. Inconsistent Verdicts

Defendant does not challenge the legal sufficiency of the evidence supporting the criminally negligent homicide conviction. We will review, however, the sufficiency of the evidence supporting the aggravated child abuse conviction even though we are reversing Defendant's convictions. If the evidence was legally sufficient to support the conviction for aggravated child abuse, reversal based upon trial error permits a remand of this case for a new trial. *State v. Howard*, 30 S.W.3d 271, 277 (Tenn. 2000) (citing *Lockhart v. Nelson*, 448 U.S. 33, 39, 109 S. Ct. 285, 102 L. Ed. 2d 265 (1988). However, if the evidence was not legally sufficient to support the conviction beyond a reasonable doubt, the guarantee against double jeopardy would mandate reversal of the conviction and dismissal of the charges. *Howard*, 30 S.W.3d at 277 (citing *Burks v. United States*, 473 U.S. 1, 10, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978).

Defendant frames her issue involving her aggravated child abuse conviction as a challenge to the consistency of the verdicts. That is, Defendant contends that because the jury found her not guilty of first degree felony murder, then they could not find her guilty of the underlying felony, aggravated child abuse, beyond a reasonable doubt. .

As our Supreme Court has long concluded, however,

[c]onsistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment. Therein lies the essential reasoning. An acquittal on one count cannot be considered res judicata to another count even though both counts

-15-

stem from the same criminal transaction. This Court will not upset a seemingly inconsistent verdict by speculation as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense which the conviction was returned.

*State v. Wiggins*, 498 S.W.2d 92, 93-94 (Tenn.1973).

In examining whether the evidence is sufficient to support Defendant's conviction of aggravated child abuse, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

The offense of aggravated child abuse is committed if a person commits the offense of child abuse or neglect and the "act of abuse or neglect results in seriously bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1). The offense of aggravated child abuse is a Class A felony if the victim is six years of age or less. *Id*. § 39-15-402(b). The offense of child abuse or neglect is committed by "[a]ny person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare." *Id.* § 39-15-401(a).

Viewing the evidence in a light most favorable to the State, Defendant bought Oxycontin pills on July 22, 2002. Mr. Kirk crushed the pills on top of the washing machine in the bathroom, and he and Defendant ingested the drug. The victim woke up and was fussy. Defendant rubbed his wet pacifier in the Oxycontin crumbs and placed the pacifier back into the victim's mouth. The victim went to sleep. The next morning, the victim showed signs of respiratory distress and died two days later. The medical examiner noted severe damage to the victim's kidneys and brain which were consistent with the ingestion of Oxycontin. Based on the foregoing, a rational trier of fact could find beyond a reasonable doubt that Defendant was guilty of aggravated child abuse.

## VI. Sentencing Issues

In its sentencing considerations, the trial court placed great weight on enhancement factor (2) based on Defendant's regular use of controlled substances. *See* Tenn. Code Ann. § 40-35-114(2). The trial court stated,

> I believe we've got number 2. I can't see much of a previous [criminal] history to support number 2, but the criminal behavior is more than abundant to give considerable weight to enhancement factor number 2. Drinking a fifth of liquor five times a week is not necessarily criminal behavior. Smoking marijuana, using cocaine and Oxycontin is. Those are all illegal substances she has used, consumed them apparently very freely and regularly. So that is an enhancement factor to which a great deal of weight will be given.

The trial court applied enhancement factor (5), the victim was particularly vulnerable because of age, to Defendant's sentence for her criminally negligent homicide conviction, but not her sentence for aggravated child abuse. *See id.* § 40-35-114(5).

The trial court also found that enhancement factor 16, violation of a private trust, was applicable. *See id.* § 40-35-114(16).

> The court's of the opinion that a mother and a father both . . . using Oxycontin and grinding it up on . . . the washing machine or dryer or something, I think. Then just because they get sleepy and put the pacifier of this child into the crumbs of that drug and administer that to a child, their child. And it can't be said that the husband did that because the wife has admitted to doing that, the mother. And I don't know of any higher position of private trust than could be expected than that of a parent and a child and particularly one that is . . . an infant only a few months old.

The trial court did not find that any mitigating factors were applicable. For her aggravated child abuse sentence, the trial court stated, "Which means that I have found enhancement factor 2 and 16 to be the ones that would be entitled to great weight and are sufficient to require the service of a sentence in the aggravated child abuse conviction of 25 years in the Tennessee Department of Corrections." Relying on the presence of enhancement factors (2) and (5), the trial court sentenced Defendant to two years for her criminally negligent homicide conviction. The trial court ordered Defendant to serve her sentences concurrently.

When a defendant challenges the length, range, or manner of service of a sentence, this Court conducts a *de novo* review with a presumption that the determinations made by the trial court are correct. *Id.* § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). "If the trial court applies

-17-

inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210; *State v. Smith*, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

As a Range I standard offender, Defendant is subject to a sentence of between fifteen and twenty- five years for her Class A felony conviction, and between one and two years for her Class E felony conviction. Tenn. Code Ann. §§ 40-35-112(a)(1) and (5). In calculating the sentence for a Class A felony conviction, the presumptive sentence is the midpoint of the range if there are no enhancement or mitigating factors. *Id.* § 40-35-210(c). In calculating the sentence for a Class E felony conviction, the presumptive sentence is the minimum in the range if there are no enhancement or mitigating factors. *Id.* If there are enhancement but no mitigating factors, the trial court may set the sentence above the presumptive sentence for the Class E felony conviction, and at or above the presumptive sentence for the Class A felony conviction, but still within the range. *Id.* § 40-35-201(d).

Defendant's only argument against the trial court's application of the foregoing enhancement factors in determining the length of both of her sentences is premised on the United States Supreme Court's recent decision in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004). Defendant contends under *Blakely* that the trial court's consideration of the enhancement factors violates his Sixth Amendment right to a trial by jury. Our Supreme Court, however, has recently concluded that Tennessee's sentencing scheme does not violate a defendant's Sixth Amendment rights as addressed in *Blakely*. *State v. Edwin Gomez and Jonathan S. Londono,* ___ S.W.3d ___, No. M2002-01209-SC-R11-CD, 2005 WL 856848, at *22 (Tenn. Apr. 15, 2005). Defendant is not entitled to relief on his *Blakely* challenge.

Although Defendant does not challenge the trial court's application of enhancement factors (2), (5) and (16) under Tennessee's sentencing scheme, we find that the trial court's consideration of these factors was appropriate. A sentence may be enhanced in the defendant has a history of prior criminal behavior. *See* Tenn. Code Ann. § 40-35-114(2). In the pre-sentence report, Defendant stated that she began using cocaine at eighteen and said that it was "just for fun." Defendant also regularly used Oxycontin, beginning at age nineteen, because "she liked them." Defendant was twenty-three years old at the time of the sentencing hearing. Defendant's continued drug use constitutes "criminal behavior" as contemplated by enhancement factor (2). *See State v. Carrico*, 968 S.W.2d 280, 288 (Tenn. 1998). The trial court's consideration of this enhancement factor was not inappropriate.

-18-

Enhancement factor (5) requires a finding that a victim was particularly vulnerable to the offense because, as relevant here, of the victim's age. *See* Tenn. Code Ann. § 40-35-114(5). "A victim's youth does not necessarily equate with vulnerability." *State v. Lewis*, 44 S.W.3d 501, 505 (Tenn. 2001) (citing *State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997)). The *Lewis* court stated,

> The State is required to proffer evidence in addition to the victim's age to establish particular vulnerability; however, that evidence "need not be extensive." *Poole*, 945 S.W.2d at 97. Also, a court may consider the natural vulnerabilities attendant to the extreme ends of the aging spectrum by giving "additional weight . . . to the age of the victim in those cases where a victim is extremely young or old."

*Lewis*, 44 S.W.3d at 505.

Dr. Mileusnic testified that the four-month-old victim weighed 12.5 pounds at the time of his death. She said that in small doses, Oxycontin acts as depressant. Inhaling or ingesting crushed Oxycontin, however, "can cause sudden and instantaneous and very high amount of drugs in the system that can actually cause sudden instantaneous death." Dr. Mileusnic agreed that the effects of crushed Oxycontin would be quickly introduced into the system of an infant the size of the victim causing the adverse effects seen in the autopsy. Moreover, because of the victim's age, he was incapable of "resisting, summoning help, or testifying against the perpetrator." *See Poole*, 945 S.W.2d at 96 (quoting *State v. Adams*, 864 S.W.2d 31, 35 (Tenn.1993). The evidence does not preponderate against the trial court's finding that consideration of enhancement factor (5) in determining the length of Defendant's sentence for criminally negligent homicide was appropriate.

The trial court also applied enhancement factor (16) to Defendant's sentence for aggravated child abuse. *See* Tenn. Code Ann. § 40-35-114(16) (Defendant abused a position of private trust in committing the offense.) Defendant, as the four-month-old victim's parent, occupied a position of private trust. *See State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996). The evidence does not preponderate against the trial court's finding that Defendant violated a private trust in committing the offenses.

Based on the presence of two enhancement factors for each offense and no mitigating factor, we cannot conclude that the trial court erred in sentencing Defendant to twenty-five years for her aggravated child abuse conviction, and two years for her criminally negligent homicide conviction. Defendant is not entitled to relief on this issue.

## CONCLUSION

In accordance with the foregoing authorities and reasoning, we reverse Defendant's convictions and remand for a new trial.

_____

THOMAS T. WOODALL, JUDGE