# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### May 6, 2003 Session

## STATE OF TENNESSEE v. GERALD E. SAYLOR

**Appeal by Permission from the Court of Criminal Appeals
Criminal Court for Washington County
No. 25854      Lynn W. Brown, Judge**

---

**No. E2001-00604-SC-R11-CD - Filed September 30, 2003**

---

We granted review to determine (1) whether the trial court erred by refusing to suppress the defendant's confession on the ground that he did not invoke his right to counsel; (2) whether the trial court erred by excluding the testimony of a witness as to an uncommunicated threat made by the victim; and (3) whether the trial court erred by denying a mistrial based on the admission of statements regarding the defendant's parole status. We conclude that the trial court properly refused to suppress the defendant's confession; that the trial court committed harmless error when it excluded proof of an uncommunicated threat; and that the trial court properly exercised its discretion by not declaring a mistrial.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals
Affirmed**

E. RILEY ANDERSON, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and JANICE M. HOLDER and WILLIAM M. BARKER, JJ., joined. ADOLPHO A. BIRCH, JR., J., filed a dissenting opinion.

Clifton Corker, Johnson City, Tennessee, for the appellant, Gerald E. Saylor.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Braden H. Boucek, Assistant Attorney General; Joe C. Crumley, Jr., District Attorney General; and Victor J. Vaughn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## Background

The defendant, Gerald Saylor, was charged with second degree murder for the killing of the victim, John Case. The evidence at trial is summarized as follows:

On November 3, 1999, Gerald Saylor and his girlfriend, Brenda Hull, were drinking alcohol with Kenneth White and John Case at around 11:00 a.m.[1] Hull testified that she and Saylor left the house at around 1:00 p.m. to buy more alcohol and returned to the house with half a gallon of vodka. Hull stated that she, White, Saylor, and Case proceeded to drink "heavily." Hull testified that at one point she went into the kitchen and saw Case hit Saylor with a hatchet or hammer. According to Hull, Saylor staggered and fell, got back up, picked up the hatchet, and hit Case several times while she begged him to stop.

Kenneth White testified that he had spent the afternoon of November 3, 1999, drinking with Hull, Case and the defendant Saylor. White stated that later in the day, Case and Saylor got into an argument in the kitchen that escalated into a scuffle. White said that Case hit the side of Saylor's head with a hatchet or hammer, causing him to fall down. Saylor then got up, grabbed the hatchet or hammer from Case, and hit him several times in the face and head. Case fell onto the couch in the living room and stopped moving. White testified that he ran next door and called the police.

When the Johnson City police officers and the emergency medical crew arrived in response to the call, they found Case barely alive, lying face down on the floor in a puddle of his own blood. Case was breathing but unresponsive; he was covered in blood and had a large cut across his nose and deep lacerations to his head. Case also had cuts to the back of his hands and across the palm of his right hand. A hatchet and an open pocketknife were found in the back of Case's pants. Blood and brain matter covered the couch, walls, floor, and ceiling of the living room. In the kitchen, the officers also found an overturned table, a broken shelf, and other signs that there had been a scuffle.

Case died later that day. According to Dr. Ellen Wallen, the medical examiner, Case died from "multiple chop wounds" which caused skull fractures, brain lacerations, and brain contusions. Dr. Murray Marks, a forensic anthropologist, testified that the victim had been struck in the head and face at least six times.

At the police station, Saylor made several comments about an attorney in the presence of the officers, which he described as an unequivocal request for an attorney and which the State deemed as equivocal. After the comments, Saylor signed a Miranda waiver and gave a videotaped statement in which he told an officer that Case hit him with the hammer. He stated that he "snapped," took the hammer, and hit Case with it. Saylor was arrested and charged with second degree murder. A jury convicted the defendant of voluntary manslaughter, and the court sentenced him to fifteen years imprisonment as a Range III, persistent offender.

---

[1] Saylor and his girlfriend were tenants in the victim's house at 904 Grover Street in Johnson City, Tennessee.

The Court of Criminal Appeals affirmed the conviction and the sentence.

We granted Saylor's application for permission to appeal.

## ANALYSIS

### Motion To Suppress

Prior to trial, the defendant Saylor moved the trial court to suppress the confession he made to an investigating officer. The trial court denied the motion, finding that the defendant made an equivocal request for counsel and that the officers were under no duty to clarify his request.

Saylor argues in this Court that he made four unequivocal requests for an attorney that, either considered separately or together, invoked his Fifth Amendment rights and precluded the officers from asking any further questions. Saylor also contends that his right to counsel under Article I, Section 9 of the Tennessee Constitution was violated because the officers did not limit their later questions to clarifying his desire for an attorney. See State v. Stephenson, 878 S.W.2d 530, 548 (Tenn. 1994).

The State contends that Saylor did not effectively invoke his right to counsel and that the investigating officers were under no legal obligation to limit the scope of their interrogation under the United States or Tennessee Constitutions.

The following evidence was introduced at the trial court suppression hearing on Saylor's motion. After Saylor was arrested, he was brought to the Johnson City Police Station where he was detained in a police interview room. A video recording revealed the following exchange between an unnamed officer and Saylor:[2]

> Officer: You're arrested ain't you?
>
> Saylor: For what?
>
> Officer: We'll let you know in a minute.
>
> Saylor: People, I haven't done nothing. Only thing I can figure is that I've violated my parole. That's the only thing I can figure. That's about the only thing I can figure.
>
> Officer: What are you on parole for?

---

[2] A redacted copy of the videotape was later played at trial.

| | |
|---|---|
| Saylor: | *Well . . . I guess it don't matter until I can get a lawyer present.* |
| Officer: | It don't make any difference to me. |
| Saylor: | *I'm supposed to have a lawyer though, don't I?* |
| Officer: | Hmm? |
| Saylor: | *I have to have a lawyer present, I reckon. Before you ask me. That's the story, isn't it?* |
| Officer: | What's that? |
| Saylor: | *You have to have a lawyer present before questioning.* |
| Officer: | I ain't asked you any questions! |
| Saylor: | That's right. |

(emphasis added). About ten minutes later, Lieutenant Debbie Baron entered the interview room and read Saylor his <u>Miranda</u> rights, reaffirming his right to an attorney. She then asked Saylor to sign a waiver of rights form, and the following exchange occurred:

| | |
|---|---|
| Saylor: | But I'll talk to you, but I don't want to waive my rights. I'll sign it, but what I'm saying is . . . |
| Baron: | Well, you basically, if you sign that you are waiving your rights. |
| Saylor: | But I haven't done nothing is what I'm trying to tell you. |
| Baron: | Well if you haven't done anything, then you don't need a lawyer, right? |
| Saylor: | No, I might need a lawyer because somebody might try to accuse me of something I didn't do. |

| Baron: | Well, I will too.  I don't know.  I can't make any promises. If you sign that, you're waiving your rights. I mean, that's what it says right there. |
|---|---|
| Saylor: | No, I don't need to do that, do I?  Of course, I haven't done anything, but . . . and I can stop at any time, right? |
| Baron: | You can stop anytime you want to. |
| | [Saylor appears to sign the form.] |
| Saylor: | I shouldn't have done that really.  Of course, I haven't done anything. |

Saylor then told Lieutenant Baron that Case hit him with a hammer, that he "snapped," and that he took the hammer away from Case and hit him with it.

The Court of Criminal Appeals affirmed the trial court's denial of the motion to suppress on the grounds that the defendant's requests for counsel were equivocal and thus did not require clarification under either the federal or state constitutions.  Moreover, the court held that regardless of whether the defendant effectively invoked his right to counsel, he subsequently waived this right before making a statement to Lieutenant Baron.

It is well-settled that a trial court's determination at a suppression hearing is presumptively correct on appeal.  State v. Harbison, 704 S.W.2d 314, 318 (Tenn. 1986).  The presumption of correctness may only be overcome on appeal if the evidence in the record preponderates against the trial court's findings.  Id.; see also State v. Kelly, 603 S.W.2d 726, 729 (Tenn. 1980); State v. Johnson, 717 S.W.2d 298, 304-05 (Tenn. Crim. App. 1986).

We begin our analysis by examining the Fifth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution.  The Fifth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, see Malloy v. Hogan, 378 U.S. 1, 6 (1964), provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]"  The corresponding provision of the Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself."  Tenn. Const. art. I, § 9. Encompassed within these constitutional provisions is the right to counsel, which is applicable whenever a suspect requests that counsel be present during

police-initiated custodial interrogation.[3]  When a suspect invokes that right to counsel, police must cease questioning until counsel is present.  See Miranda v. Arizona, 384 U.S. 436, 444-45 (1966); see also Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); State v. Stephenson, 878 S.W.2d 530, 548 (Tenn. 1994).

Although courts have clearly held that all police questioning must cease when an accused invokes the constitutional right to counsel, there has been uncertainty as to what constitutes a valid invocation of that right under the Fifth Amendment and Article I, Section 9.  When the Supreme Court decided Miranda, for example, it did not adopt a rigid formula for invocation of the Fifth Amendment right to counsel, but stated generally that the right was effectively invoked when a suspect "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking . . . ."  Miranda, 384 U.S. at 444-45.  The Court later clarified in Michigan v. Jackson that courts should "give a broad, rather than a narrow interpretation to a defendant's request for counsel."  475 U.S. 625, 633 (1986).

Eight years later, however, the Supreme Court narrowed this standard and held that "[i]nvocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'"  Davis v. United States, 512 U.S. 452, 459 (1994) (quoting McNeil v. Washington, 501 U.S. 171, 178 (1991).  Accordingly, the Court concluded that ambiguous requests for counsel do not constitute an invocation of the right to counsel and therefore, do not trigger the Fifth Amendment's prohibition on further questioning.  See Davis, 512 U.S. at 461.  Moreover, the Court specifically refused to adopt a rule requiring officers to ask questions clarifying the accused's statements.  Id. at 461-62.

This Court has also struggled with defining the proper standard for a valid invocation of the right to counsel under Article I, Section 9.  In Stephenson, for instance, we applied the decision in Michigan v. Jackson and held, under both the United States and Tennessee Constitutions, "that when a suspect makes an ambiguous or equivocal request for counsel, further questions by officers thereafter must be limited to clarifying the suspect's desire for an attorney."  Stephenson, 878 S.W.2d at 548.  The officer did ask clarifying questions, the defendant waived his right to an attorney, and the case was reversed on other grounds.

Two years later, we adopted a similar standard to that enunciated in Davis v. United States that "[a]lthough a suspect need not speak with the discrimination of an Oxford don," the accused "must articulate his desire to have counsel present sufficiently clearly that a reasonable officer would understand the statement to be a request for an attorney."  State v. Huddleston, 924 S.W.2d 666, 669-70 (Tenn. 1996) (quoting Davis, 512 U.S. at 459).  In Huddleston, we held there was no request for an attorney under this standard, but reversed on other grounds.  Id., 924 S.W.2d at 670, 676.  In adopting this rule, however, this Court did not specifically reference Stephenson or Article I, Section 9 of the Tennessee Constitution, nor did it engage in an exhaustive discussion.

---

[3] In contrast, the Sixth Amendment right to counsel guarantees the accused the assistance of counsel after the adversarial judicial process has begun.  See Michigan v. Jackson, 475 U.S. 625, 630-32 (1986).

As a result, Saylor claims that the Tennessee Constitution, as interpreted by Stephenson, still requires police officers to limit the scope of their questions following an equivocal request for counsel. In Stephenson, we summarized other court decisions and observed that most, including five state court decisions, had adopted the Michigan v. Jackson standard. Stephenson, 878 S.W.2d at 548. Since that time, however, a number of other states have applied the later Davis standard.[4]

Accordingly, the viability of Saylor's argument depends upon whether the right to counsel protections of Article I, Section 9 are broader than those of the Fifth Amendment. In State v. Smith, 834 S.W.2d 915 (Tenn. 1992), this Court noted that the state constitutional provision might be applied more broadly than its federal counterpart "based upon considerations other than, and in addition to, the difference in terminology." Id. at 918.[5] However, as detailed above, this Court has chosen to apply a standard similar to the federal standard when assessing the validity of invocations of the right to counsel under our state constitution. See Stephenson, 878 S.W.2d at 548. Furthermore, we have never held that the protections under Article I, Section 9 are broader than those under the Fifth Amendment in this specific context.

Therefore, we hold today what we implicitly held in Huddleston: The standard for a valid invocation of the right to counsel is the same under both Article I, Section 9 and the Fifth Amendment. The accused "must articulate his desire to have counsel present sufficiently clearly that a reasonable [police] officer . . . would understand the statement to be a request for an attorney." Huddleston, 924 S.W.2d at 670 (quoting Davis, 512 U.S. at 459). If the suspect fails to make such an unambiguous statement, police may continue to question him without clarifying any equivocal requests for counsel. Id. We find the following observation in Davis persuasive:

> The *Edwards* rule[6] – questioning must cease if the suspect asks for a lawyer – provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. But if we were to require

---

[4] See Higgins v. State, 879 S.W.2d 424, 428 (Ark. 1994); People v. Cunningham, 108 Cal. Rptr. 2d 291, 343-44, 25 P.3d 519, 563 (Cal. 2001); State v. Anonymous, 694 A.2d 766, 775 (Conn. 1997); State v. Owen, 696 So. 2d 715, 719 (Fla. 1997); Taylor v. State, 689 N.E.2d 699, 704 (Ind. 1997); State v. Caenen, 19 P.3d 142, 150 (Kan. 2001); Harte v. State, 13 P.3d 420, 429 (Nev. 2000); State v. Salinas, 706 N.E.2d 381, 386 (Ohio Ct. App. 1997); Dennis v. State, 990 P.2d 277, 288 (Okla. Crim. App. 1999); State v. Charboneau, 913 P.2d 308, 317, 320-21 (Or. 1996); State v. Kennedy, 479 S.E.2d 838, 845 (S.C. Ct. App. 1996); State v. Aesoph, 647 N.W.2d 743, 752 (S.D. 2002); State v. Warness, 893 P.2d 665, 667 (Wash. Ct. App. 1995); State v. Jennings, 647 N.W.2d 142, 150-52 (Wis. 2002). In contrast, we have found only four states that have rejected the Davis standard. See State v. Hoey, 881 P.2d 504, 522-23 (Haw. 1994); State v. Risk, 598 N.W.2d 642, 648 (Minn. 1999); State v. Spang, 48 P.3d 727, 732-34 (Mont. 2002); State v. Chew, 695 A.2d 1301, 1318 (N.J. 1997).

[5] In Smith, we held that "adherence to the spirit and principles of Article I, § 9 . . . required us to hold that the test of voluntariness for confessions under Article I, Section 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." 834 S.W.2d at 919.

[6] See Edwards v. Arizona, 451 U.S. 477 (1981).

questioning to cease if a suspect makes a statement that *might* be a request for an attorney, this clarity and ease of application would be lost. Police officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he hasn't said so, with the threat of suppression if they guess wrong.

Id., 512 U.S. at 461 (emphasis in original); see also State v. Owen, 696 So. 2d 715, 719 (Fla. 1997) (discussing Davis).

The defendant argues the statements he made during the interview were unequivocal requests for counsel. We disagree. Saylor's remarks, which were made to an unnamed officer and not to the questioning detective, are better categorized as generic and equivocal statements made by a person who is still in the decision making process. No reasonable police officer in these circumstances would understand Saylor's remarks to be an unequivocal request for an attorney. Consequently, the detective was free to continue questioning Saylor. The evidence does not preponderate against the trial court's finding that the defendant did not make an unequivocal request for counsel. Accordingly, Saylor's federal and state constitutional right to counsel claims are without merit.

Moreover, we believe, as did the Court of Criminal Appeals, that the defendant's claim must fail regardless of the invocation standard we apply. The evidence shows that at the time of his videotaped statements, the defendant was under arrest in a police interview room with an unidentified officer. The defendant was aware he was going to be questioned and in anticipation of that questioning, made several equivocal requests for counsel to the unidentified officer. Subsequently, Lieutenant Baron entered the interrogation room, read the defendant his rights, and asked him to sign a waiver of rights form. The defendant initially said that he did not want to waive his rights, but then decided to sign it after Lieutenant Baron explained that he would be waiving his rights if he signed the form. Under these facts, we conclude that the defendant made equivocal requests for counsel, that Lieutenant Baron clarified these requests by explaining the waiver of rights form, and that by signing the form, the defendant decided not to have an attorney present during questioning. Consequently, the trial court did not err when it ruled that defendant's videotaped statement was admissible at trial.

**Exclusion of Victim's Threat**

The defendant next challenges the trial court's exclusion of testimony defense counsel sought to elicit from witness Ruthie Hall. The record reflects that during the direct examination of Ruthie Hall, defense counsel requested a bench conference and informed the trial court that he was going to attempt to elicit testimony regarding a threat made by the victim on the day he died. The trial judge dismissed the jury and held a jury out hearing in which Hall testified that at 1:55 p.m. on the day Case was killed, Case said "he was going to kill [Saylor]." This threat was never communicated to Saylor. The State objected to the introduction of this statement and, after a lengthy discussion, the trial judge sustained the objection:

[T]he court [is] of the opinion that [the statement's] slight probative value was more than substantially outweighed by dangers of prejudice to the jury's rational and [un]impassioned consideration of the evidence because it – if they made the mistake and became confused and considered that in self-defense, or any [sic] than the issue of first aggressor which is clearly not only proved by two witnesses, but, also stipulated then the entire instructions–that instruction becomes virtually meaningless.

Saylor argues that the trial court improperly excluded Hall's testimony that the victim, John Case, had threatened to kill him and that the testimony was necessary to support his self-defense theory. The State argues that the trial court properly excluded Hall's testimony because it was hearsay and irrelevant.

In Tennessee, admissibility of evidence is within the sound discretion of the trial judge. See Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 442 (Tenn. 1992). When arriving at a determination to admit or exclude even that evidence which is considered relevant, trial courts are generally accorded a wide degree of latitude and will only be overturned on appeal where there is a showing of abuse of discretion. Id.

We addressed the admissibility of uncommunicated threats made by a victim against a defendant in State v. Butler, 626 S.W.2d 6 (Tenn. 1981). In Butler, the defendant was convicted of second degree murder for the shooting death of his wife. The defendant admitted to the shooting, but insisted that it was in self-defense.[7] To support this theory, the defense counsel proffered a witness who would testify that the victim had previously brandished a .22 caliber pistol and said "[she was going] to get rid of that son-of-a-bitch one way or another." Id., 626 S.W.2d at 12 (bracketing in original). The trial court concluded that the statement was inadmissible because it was

---

[7] The defendant in Butler raised the common law defense of self-defense. Tennessee officially codified the doctrine of self-defense in 1989 at Tennessee Code Annotated section 39-11-611. The statute provides:

> (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, must be founded upon reasonable grounds.
>
> . . . .
>
> (d) The threat or use of force against another is not justified if the person provoked the other individuals use or attempted use of unlawful force . . . .

Tenn. Code Ann. § 39-11-611(a), (d) (1997).

not communicated to the defendant. This Court held that the trial court committed reversible error by refusing to allow the jury to hear the evidence.

> The character of the deceased for violence, as well as her animosity toward the defendant, as indicated by words and actions at the time of the killing and before, are proper matters for consideration of the jury upon the question of self-defense. In some cases where self-defense is an issue, uncommunicated threats made by a deceased against a defendant are admissible as going to the state of mind of the deceased. However, the applicability of this rule is limited and it becomes operative only where relevant to explain the conduct of the deceased in establishing who was the aggressor.

Id. at 11 (citations omitted); see also Little v. State, 65 Tenn. 491, 493 (1873). We further held that the statement should not be excluded even where there was other overwhelming evidence showing that the victim was the aggressor. Rather, we found this to be a question of weight of the evidence properly resolved by the jury. Butler, 626 S.W.2d at 11.

We think that Butler controls the issue in the case before us. Ruthie Hall's testimony consisted of an uncommunicated threat made by the victim, John Case, towards Saylor prior to the victim's death. Under Butler, such testimony is admissible as an exception to the rule excluding hearsay statements as an indication of the victim's state of mind, and it is relevant to establish the victim's status as the aggressor. Id., 626 S.W.2d at 11.

We reject the State's argument that the testimony was properly excluded simply because the parties had stipulated that Case was the aggressor. The State's argument, which is tantamount to concluding that a stipulation always serves as conclusive proof of the facts so stipulated in a criminal case, is not supported by authority. Indeed, we rejected a similar argument in Butler by holding that the uncommunicated threat was admissible even where there was overwhelming evidence because such issues affect the weight of evidence and are thus properly resolved by the jury. Moreover, the State's position conflicts with decisions of our appellate courts that have upheld the admission of stipulated evidence on more than one occasion. See Hunter v. Burke, 958 S.W.2d 751, 755 (Tenn. Ct. App. 1997) (upholding admission of confession even though defendant stipulated as to liability); State v. Hill, 885 S.W.2d 357, 360-61 (Tenn. Crim. App. 1994) (upholding trial court's decision to allow victim to remove his shirt to show scars even though the defendant had stipulated that victim had sustained bodily injury).

Moreover, the State's argument ignores the fact that Rule 403 of the Tennessee Rules of Evidence is narrow in its application and is a rule of admissibility that places a heavy burden on the party seeking to exclude evidence. See State v. James, 81 S.W.3d 751, 757 (Tenn. 2002) (quoting Roy v. Diamond, 16 S.W.3d 783, 791 (Tenn. Ct. App. 1999)). "[E]xcluding relevant evidence under [this rule] is an extraordinary remedy that should be used sparingly, . . . and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." White

v. Vanderbilt Univ., 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999) (citations omitted).  In short, the existence of a stipulation by itself is not sufficient to invoke the narrow provisions of Rule 403.[8]

Accordingly, we hold that the existence of substantial evidence – including a stipulation – establishing the victim as the aggressor does not, by itself, preclude the admission of an uncommunicated threat.  By excluding Ruthie Hall's testimony, the trial court in this case effectively denied Saylor an opportunity to present relevant and probative evidence to the jury on a critical element of his claim of self-defense.  Case's threat against Saylor was never related to the jury, which ultimately rejected Saylor's self-defense claim.  Furthermore, we do not believe that the State carried its burden under Rule 403 to show that the danger of unfair prejudice resulting from the admission of Case's threat substantially outweighed the probative value of Ms. Hall's testimony. We therefore conclude that the trial court erred.

Having concluded that it was error for the trial court to exclude Ruthie Hall's testimony, we must now resolve whether such error affected the jury's verdict and requires a new trial.  We have previously explained that "nonconstitutional errors will *not* result in reversal unless the error affirmatively appears to have affected the result of the trial on the merits . . . ."  State v. Harris, 989 S.W.2d 307, 315 (Tenn. 1999) (citing Tenn. R. Crim. P. 52(a)) (emphasis in original).

Here, the uncontroverted evidence establishing Case as the first aggressor was substantial. Brenda Hull testified that Saylor did not strike the victim until after Case had hit him with the hammer and knocked him to the ground.  Kenneth White likewise testified that Case hit Saylor with the hammer before Saylor retaliated.  The defendant's videotaped statement repeatedly asserted that Case had hit Saylor with a hammer first and the State stipulated that Case had been the first aggressor.  In addition, the evidence demonstrated that by striking the victim at least six times in the head with enough force to shatter the victim's skull, the defendant's actions were not reasonably necessary to protect himself.  In sum, we cannot conclude that the exclusion of the victim's uncommunicated threat affected the outcome of the trial on the merits.

**Mistrial**

Finally, defendant Saylor contends that the trial court erred in denying his motion for a mistrial following the introduction by the State of the videotaped interview.  Defense counsel argues that a mistrial was required based on the admission of evidence indicating that Saylor was on parole when the offense was committed.  The State contends that the trial court was within its discretion to refuse to order a mistrial.

---

[8] Although not controlling law, the Tennessee pattern jury instructions for civil cases require the jury to regard stipulated facts as proven; however, there is no such provision in the Tennessee pattern jury instructions for criminal cases.  See 8 Tn. Prac. Pattern Jury Instr.-Civ T.P.I. 3-Civ. 15.03 (2002). Moreover, under federal practice, stipulations support the existence of a fact, but do not necessarily prove the fact conclusively:  "When the attorneys on both sides stipulate or agree as to the existence of a fact, you may accept the stipulation as evidence and regard that fact as proved. You are not required to do so, however, since you are the sole judge of the facts."  See 1A Fed. Jury Prac. & Instr. § 12.03 (5th ed. 2002). See also Old Chief v. United States, 519 U.S. 172, 200 (1997) (O'Connor, J., dissenting).

In a pretrial hearing, defense counsel had moved that the defendant's statements that he was "on the run" and "on parole" be redacted from the videotaped interview, and the trial court agreed. The State agreed to work with defense counsel to redact any such objectionable portions from the videotape. Notwithstanding counsels' efforts to redact such portions, the statements may have been audible when the videotape was played for the jury during Lieutenant Baron's testimony at trial. After the State played the tape for the jury, a bench conference was held where the following exchange occurred:

| | |
|---|---|
| Defense: | I was a little concerned when he said he was on the run. I thought we'd cut that out. |
| THE COURT: | On the run? |
| Defense: | It sounded like he said that. |
| THE COURT: | I didn't – I didn't hear that. |
| State: | I didn't hear that. |
| THE COURT: | That would have been – that would have been relevant. |
| Defense: | I think he said I was on the run, and I thought I heard the word parole, and we tried to get that out. |
| THE COURT: | All right. I'll just tell the jury that you want to take a break. |

. . . .

| | |
|---|---|
| Defense: | Yeah, I think probably just to protect the record there if there was a mention of the word parole, that was supposed to have been edited out, and . . . |
| THE COURT: | I didn't hear it. |
| Defense: | And for that reason I think – I don't know if – I guess for the protection of the record. I know it was an hour and twenty minute interview almost. It may be lost, but I think |

-12-

> just for the – I mean, I think I'm obligated to
> say mistrial, Your Honor. . . .

Although the trial court offered to give a curative instruction, defense counsel declined because he feared it would draw the jury's attention to Saylor's statements. Defense counsel instead moved for a mistrial. The trial court overruled the motion after finding that the error did not rise to the level of manifest necessity to warrant a mistrial.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only if there is a manifest necessity for such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). An appellate court will not disturb that decision unless there is an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990).

We hold that the trial court did not abuse its discretion in finding that the unredacted videotape did not justify declaring a mistrial. The record reflects that the trial court, the defense, and the State disagreed as to what was audible on the videotape. Furthermore, the record does not reflect any evidence that the jury heard Saylor's statements that the offense occurred when he was on parole or "on the run." Because the defendant has not demonstrated a manifest necessity warranting a mistrial, he is not entitled to relief.

## CONCLUSION

We conclude that the trial court properly refused to suppress the defendant's confession; that the trial court committed harmless error when it excluded Ruthie Hall's testimony; and that the trial court properly exercised its discretion by not declaring a mistrial. The judgment of the Court of Criminal Appeals is affirmed. It appearing that the defendant, Gerald Saylor, is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
E. RILEY ANDERSON, JUSTICE