# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### May 21, 2013 Session

## STATE OF TENNESSEE v. CLEVEN JOHNSON

**Appeal from the Criminal Court for Knox County**
**No. 89645     Jon Kerry Blackwood, Judge**

---

**No. E2012-02303-CCA-R3-CD - Filed September 4, 2013**

---

The defendant, Cleven Johnson, appeals his Knox County Criminal Court jury conviction of aggravated sexual battery, claiming that (1) the evidence was insufficient to support his conviction; (2) the trial court erred by refusing to grant his motion for mistrial; (3) the trial court erred by admitting photographs of the crime scene, and of a victim's injuries and by admitting evidence of the defendant's guilty plea to accompanying offenses; and (4) the sentence was excessive.  Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and CAMILLE R. MCMULLEN, J., joined.

Leslie M. Jeffress, Knoxville, Tennessee, for the appellant, Cleven Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Randall E. Nichols, District Attorney General; and TaKisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On January 21, 2009, the defendant pleaded guilty to a multitude of felony offenses arising out of the home invasion of Jennifer and Michael Morton.  In Count 19 of case 89645, the defendant was charged with aggravated sexual battery, but he entered a plea of guilty to the lesser-included offense of attempted aggravated sexual battery.  Five months later, the defendant filed a petition for post-conviction relief, and the trial court granted the defendant a new trial with respect to the aforementioned Count 19.

The trial court conducted a jury trial in February 2012, which ended in a hung

jury, and the trial court granted a mistrial. A second jury trial was conducted in May 2012.

At trial, S.U.[1] testified that, on March 29, 2008, she was a 15-year-old high school student who joined her cousins, K.M. and S.M., at the Mortons' residence to babysit their 10-year-old son, "L.M." While at the Mortons' home, the three girls invited their boyfriends over to watch a movie. At the conclusion of the movie, their boyfriends left the house, and the girls and L.M. fell asleep. Sometime later, S.U. awoke to the sound of a "bang" as an intruder hit S.M. in the head with a handgun. The intruders forced the girls and L.M. into a bathroom. S.U. testified that there were four intruders, although she never saw the fourth intruder because he stayed downstairs throughout the home invasion. S.U. stated that the defendant held them at gunpoint and took all of their cellular telephones. The defendant and the other intruders repeatedly asked the girls to tell them where the "drugs and money" were located.

Eventually, the Mortons returned home, and the intruders took the couple into the bathroom and moved the three girls into an adjacent hallway. S.U. stated that the intruders ripped out Mr. Morton's earrings, forced him to strip down to his boxer shorts, and "they were going to burn him with a curling iron." S.U. also testified that one of the intruders "put a gun up" Mrs. Morton's skirt, although she was unable to identify which of the intruders was the perpetrator. S.U. testified that she could hear the intruders ransacking the house. Sometime later, the intruders bound the girls' hands with shoelaces and instructed everyone to count to 100. Once they had finished counting, Mrs. Morton called 9-1-1. Before law enforcement officers arrived, the three girls drove to the hospital so that medical personnel could treat the wound to S.M.'s head. S.U. did not speak with any law enforcement officers at the hospital.

S.U. testified that, on May 23, 2008, she went to the police station to view a photographic lineup of potential suspects. She selected the defendant's photograph as being one of the intruders on March 30. At trial, she again positively identified the defendant as one of the intruders.

On cross-examination, S.U. admitted that law enforcement officers did not question her at the hospital on March 30, nor did she provide a description of the intruders to officers at that time. When asked to describe the defendant's appearance on the night of the home invasion, S.U. stated that he was wearing Nike shoes and a black, large t-shirt or sweatshirt. With respect to his facial hair, S.U. described the defendant as having "peach fuzz."

---

[1]We decline to identify by name the minor victims.

On redirect examination, S.U. affirmed that, at trial, the eyes of the defendant were the same eyes she looked into on the night of the home invasion.

K.M. testified that she was a 17-year-old high school student on March 29, 2008. She recalled that she was asleep on the Mortons' sofa when she awoke "to a gun barrel in [her] mouth" and was told that she "was going to die if [she] didn't do what [she] was told." She stated that the intruders were inquiring "where the dope was." She described the intruders as the defendant, one man who was taller than the defendant, and one man who was shorter than the defendant. Eventually, the intruders moved her into the bathroom and told her to lie face down, where she remained for the rest of the home invasion. K.M. testified that she had never seen the defendant before that night but that she had a clear view of his face on the night of the home invasion. She described the defendant as wearing a baseball cap. K.M. testified that the defendant was the intruder designated to keep the girls and L.M. together and move them from room to room. K.M. stated that she was unable to see what happened to Mrs. Morton.

K.M. testified that she did not speak with any law enforcement officers at the hospital. Several weeks later, K.M. saw the defendant's photograph on television and recognized him from the home invasion. K.M.'s mother contacted the police department and arranged for her daughters and S.U. to view a photographic lineup. Once at the police station, K.M. viewed the lineup separately from her sister, S.M., and S.U. K.M. stated that she, her sister, and S.U. were not allowed to speak to one another until each girl had completed the lineup. From the lineup, K.M. selected the photograph of the defendant and identified him as one of the intruders. At trial, K.M. again positively identified the defendant as one of the intruders on March 29, stating that "[i]t's eyes and a face that you'll never forget." K.M. stated that she was also able to identify the defendant based on his voice, which she heard on the computer.

On cross-examination, K.M. described the defendant, as she recalled his appearance at the home invasion, as tall and slim. She stated that he was wearing tennis shoes and a baseball cap.

Victim Jennifer Morton testified that on March 29, she and her husband had hired babysitters for their son, L.M., so they could go out to a club with friends. She and her husband returned home around 3:00 a.m., and she noticed that a floodlight was on. Shortly after entering the house, Mrs. Morton and her husband were accosted by the intruders at gunpoint. Mrs. Morton testified that she did not look at the faces of the intruders because they instructed her not to look at them and because she was "scared for [her] life." The intruders initially moved the Mortons upstairs, where the intruders demanded money. Mrs. Morton stated that the intruders emptied her purse, taking the cash and credit cards contained

-3-

therein. One of the intruders then forced Mrs. Morton to return downstairs, where he continued to demand money and valuables. At one point, the intruder instructed her to take off her clothes. She started to comply, but the intruder "got distracted," and she stopped. This intruder then brought Mrs. Morton back upstairs, forced her to lie down on top of her husband, and tied her hands behind her back. Mrs. Morton described what happened next:

| | |
|---|---|
| Mrs. Morton: | And a gun – the guy put a gun up my skirt and right there, basically at my vagina and was counting down for anything that they – you know, I guess they were looking for drugs and whatever else, but . . . |
| | So they proceeded to – he stopped. Because one guy was like – he's like – he said, dude, chill out, you know. |
| | . . . . |
| Prosecutor: | Let me – let me back you up just real briefly, just for the elements. Whenever the guy stuck the gun up underneath your skirt – |
| Mrs. Morton: | Uh-huh. |
| Prosecutor: | – did the gun come into contact with your vagina? |
| Mrs. Morton: | Yes. Because, I guess with – I don't know. It was weird, I guess, the way the underwear was sitting at the time, but, yeah. |
| Prosecutor: | And when the guy had the gun underneath your skirt, what was the person – what was the per – what did you hear? What were they saying? |
| Mrs. Morton: | Tell me where the money is or we're going to kill her. |

| Prosecutor: | And you said that you heard a countdown? |
|---|---|
| Mrs. Morton: | Yeah. It was like, ten, nine, eight. And he got interrupted. He said, chill out, dude. There's nothing. There's nothing. Just – and that's just when I heard them just taking stuff, like TVs, ripping them off the walls, computers, everything. |

. . . .

| Prosecutor: | How did it make you feel when he had the gun up underneath your skirt touching your vagina? |
|---|---|
| Mrs. Morton: | I immediately just started praying and – please, God, you know, so . . . . |

After the intruders left, Mrs. Morton contacted the police. She testified that she was unable to identify any of the intruders.

On cross-examination, Mrs. Morton clarified that when she was forced to lie down on top of her husband, her husband was lying face down as well. She stated that the bathroom light was on and that the bathroom was visible from the attached spare bedroom, which is where she believed the girls were located.

S.M. testified that she was 15 years old in March 2008. The Mortons had contacted her to babysit their son, and S.M. agreed. She invited S.U. and K.M. to join her. The girls arrived around 8:00 p.m. Late that night, S.U., K.M., and L.M. had fallen asleep. S.M. heard the family dog barking, and she went to investigate. At that point, the defendant appeared, put S.M. in a choke hold, and placed a gun to her head. He told her that he would kill her if she did not tell him "where the dope was." She insisted that she knew nothing and explained that she was simply the babysitter. The defendant asked where the homeowners were, and S.M. responded that they had gone out and would not be home until 1:00 or 2:00 a.m. The defendant dragged her upstairs and told his accomplices to wake the others. The defendant told his accomplice, known as Blood, to take custody of S.M. Blood dragged S. M. down a hallway and "pistol whipped" her above the eyebrow. Blood then passed S. M. to a third man, who attempted to unbutton her pants "as though he was going to sexually assault" her, although he did nothing else. The man pushed S.M. into the bathroom and forced her to sit in the bathtub.

Once the Mortons returned home, the defendant and his accomplices moved the girls and L.M. into a hallway. The intruders forced L.M. to lie on top of S.U. and asked the boy, "[H]ave you ever had p***y before?" S.M. witnessed the defendant put a gun "up [Mrs. Morton's] vagina." S.M. testified that she "was right there in front of [Mrs. Morton] watching this the whole time – and [the defendant] said, if you do not tell me where the dope and the money is, I will kill you." At that point, Mrs. Morton gave the intruders money that was located underneath a bed, and the intruders left the house, after restraining all of the victims and instructing them to count to 100. S.M. positively identified the defendant as the intruder who sexually assaulted Mrs. Morton, stating "you never forget those eyes."

Sometime later, S.M. saw a photograph of the defendant on the computer. She informed her mother, who contacted the police, and S.M. went to the police station to participate in a photographic lineup. From the lineup, she was able to positively identify the defendant as the intruder who committed the sexual assault upon Mrs. Morton. S.M. also testified that she heard the defendant's voice on the television and that she was able to identify the voice as belonging to the defendant.

On cross-examination, S.M. admitted that she spoke with a police officer at the hospital on the morning of March 30, and she described the defendant as being approximately six feet tall and weighing about 180 pounds. She also stated that he had a shaved head, a full beard, and a mustache. She stated that he was wearing a red jacket but was not wearing a baseball cap.

Janice Norman with the Knox County criminal court clerk's office testified that the defendant, on January 21, 2009, pleaded guilty to the following charges: aggravated burglary of the Mortons' residence; weapons possession; facilitation of especially aggravated kidnapping of S.M.; facilitation of especially aggravated kidnapping of K.M.; facilitation of especially aggravated kidnapping of Jennifer Morton; facilitation of especially aggravated kidnapping of Michael Morton; facilitation of especially aggravated kidnapping of L. M.; aggravated robbery of Michael Morton; aggravated assault of S.M. while in possession of a deadly weapon; and aggravated assault of Michael Morton while in possession of a deadly weapon.

With this evidence, the State rested its case. Following a *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the defendant elected not to testify but did choose to offer proof.

Michael Morton testified on behalf of the defense and stated that he operated a night club in Knoxville. On the evening of March 29, he went to work at the club. His wife, Jennifer, joined him at the club, and they came home together at approximately 3:30

a.m. on March 30. When the couple reached their front door, the intruders confronted them at gunpoint and forced them inside. Mr. Morton stated that the intruders forced him onto his stomach, removed his jewelry, and tied his hands behind his back. He testified that it was too dark for him to identify any of the intruders, and he testified that he could not say whether the defendant was one of the men inside his home that night.

Special Agent Kimberly Bryant, a forensic scientist with the Tennessee Bureau of Investigation, testified that she processed several items from the crime scene: a glove, a backpack, a baseball cap, and a toboggan. She tested each of the items to determine whether any contained the deoxyribonucleic acid ("DNA") of the defendant. Special Agent Bryant was able to exclude the defendant as the wearer of the toboggan, but the DNA obtained from the other items could not, for various reasons, be linked to the defendant or anyone else.

Ashley Thompson, the mother of one of the defendant's children, testified that she and the defendant were romantically involved for five years. Their son was born in February 2008, and according to Ms. Thompson, the defendant went to Alabama prior to March 23, 2008, and he did not return to Knoxville until mid-April. Ms. Thompson testified that the purpose of the defendant's trip to Alabama was to assist his sister in moving. She stated that, if the defendant had returned to Knoxville prior to mid-April, he would have visited their son. Ms. Thompson also testified that the defendant never wore red and that "he wasn't a hat person." She estimated the defendant's weight to be below 130.

On cross-examination, Ms. Thompson acknowledged that she received a letter from the defendant in June 2008 while he was incarcerated. The letter referenced Brandy Gibby, the mother of one of the defendant's other children. The defendant wrote, in pertinent part:

> what night is Brandy talking about tell her to be exact on what
> date I need it to be accurate on March 30 - 08 she picked me up
> from our house and dropped me off back off at the house.

Ms. Thompson also acknowledged that another letter, this one written to Ms. Gibby, was authored by the defendant and stated:

> But right now I need a friend thank u 4 being that I do want you
> back. I was with you on March the 30 all night . . . tell me that
> I was with you.

Latashia Johnson, the defendant's sister, testified that sometime after March 8, 2008, the defendant came to Huntsville, Alabama to assist her in moving to a new

residence. Although she could not say with any certainty that the defendant was in Alabama with her on March 30, she stated that "he was in Huntsville in March when I moved and it was towards the end, but I don't know [the] exact date." She also could not say when he returned to Tennessee. Ms. Thompson stated that the defendant has "always been skinny" and that she did not believe he weighed 180 pounds during March 2008. She also testified that she could not recall "ever seeing [the defendant] in red, period."

Based on this evidence, the jury convicted the defendant as charged of aggravated sexual battery. Following a sentencing hearing, the trial court imposed an 11-year sentence and ordered that it be served consecutively to the defendant's other convictions in case 89645.

Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the evidence adduced at trial was insufficient to support his conviction, that the trial court erred by denying his motion for mistrial, and that the trial court erred by admitting certain evidence at trial. In addition, the defendant challenges both the length and alignment of his sentence. We consider each claim in turn.

*I. Sufficiency*

The defendant levels two attacks on the sufficiency of the convicting evidence, claiming first that the trial court erred by denying his motions for judgment of acquittal and second that the totality of the evidence adduced at trial did not support his conviction of aggravated sexual battery.

The defendant claims that the trial court erred by denying his motion for judgment of acquittal at the close of the State's proof because the State's witnesses failed to properly identify him as one of the perpetrators, because he had an alibi, and because the State failed to prove that the sexual contact was for the purpose of sexual gratification. The defendant contends that he made two motions for judgment of acquittal, one at the close of the State's proof and another at the close of all proof. The record, however, does not reflect that the defendant, at any point during the trial, moved for a judgment of acquittal. Accordingly, we will address this claim no further and will now review the sufficiency of the convicting evidence.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324

(1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, aggravated sexual battery is "unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by . . . [f]orce or coercion . . . to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon." T.C.A. § 39-13-504(a)(1) (2006). "Sexual contact" is "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6). Additionally, "intimate parts" are defined as "the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* § 39-13-501(2).

Here, the proof adduced at trial established that the defendant forced Mrs. Morton to lie down, and he placed a firearm between her legs. Mrs. Morton testified that the firearm came in contact with her vagina, and S.M. testified that she witnessed the defendant commit this reprehensible act. The defendant argues that the firearm's contact with Mrs. Morton's vagina cannot "be reasonably construed as being for the purpose of sexual arousal or gratification." We disagree.

First, the defendant contends that the prosecutor did not attempt to prove sexual gratification because she stated, in her opening statement, that the State was "not advancing towards you that [the intruders'] purpose that night was to enter the house to sexually assault somebody," but that instead "the whole purpose of that crime that night was to get the money and the weed." It is well-settled that opening statements are not evidence. *See State v. Van Tran*, 864 S.W.2d 465, 475 (Tenn. 1993). Furthermore, the proof at trial sufficiently demonstrated that the sexual contact perpetrated by the defendant could be "reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). Mrs. Morton testified that one of the intruders walked her downstairs at gunpoint

and ordered her to disrobe, although he became distracted and failed to enforce this order. Mrs. Morton stated that this was the same intruder who forced the firearm under her skirt, causing it to come in contact with her vagina a short time later, and Ms. Maples identified the perpetrator as the defendant. The fact that he had previously ordered Mrs. Morton to undress is indicative of his sexual interest.

Moreover, *State v. Meeks*, 876 S.W.2d 121 (Tenn. Crim. App. 1993), is instructive on this issue. In *Meeks*, the defendant, who was holding the victim at gunpoint, grabbed the victim's breast and threatened to "do stuff" to her if the victim's husband failed to cooperate. *Id.* at 130. The defendant also told the victim that he planned to "have a little fun with [her]" and, while forcing the victim down a hallway, he stated, "okay, pretty thing, you're going with me." *Id.* at 130-31. On appeal, the defendant argued that his conduct was intended to force the victim's husband to cooperate and that it was not for the purpose of sexual gratification. *Id.* at 131. This court disagreed, holding that the evidence was sufficient to support the conviction of aggravated sexual battery:

> We recognize that jurors may use their common knowledge and experience in making reasonable inferences from evidence. . . . Since the defendant already had [the victim] at gunpoint, it was unnecessary for him to grab her breast in order to elicit [her husband's] cooperation. This is particularly true in light of the fact that [the husband] was face down on the floor at the time of the grabbing and could not have seen the incident. Since the offensive contact was not "essentially incidental" to the robbery, the jury could have drawn on common knowledge to reasonably infer that the defendant had grabbed [the victim's] breast for the alternate purpose of sexual gratification.

*Id.*

The facts of the instant case are strikingly similar. The sexual contact occurred when the defendant already had Mrs. Morton at gunpoint, and Mr. Morton was face down at the time of the assault and was unable to see what was transpiring. The defendant could have placed the gun to Mrs. Morton's head just as easily, but instead, he chose to force it between her legs, coming in contact with her vagina. As in *Meeks*, the jury could have used their common knowledge and experience to make the reasonable inference that the defendant's conduct was intended for the purpose of sexual gratification.

The defendant also argues that the State failed to prove his identity as one of the intruders and that he provided an alibi for the night of the crime. We disagree with both

-10-

of these contentions. S.U., K.M., and S.M. all positively identified the defendant, in separate photographic lineups, as one of the intruders, and, most significantly, S.M. positively identified the defendant as the perpetrator of the aggravated sexual battery on Mrs. Morton. S.U. identified the defendant based on his eyes. K.M. testified that, with respect to the defendant, "it's eyes and a face that you'll never forget." S.M. testified that "you never forget those eyes." Both K.M. and S.M. also testified that they recognized the defendant's voice when they heard it on the computer and on television. Although each girl's physical description of the defendant varied slightly, all three were confident in their recognition of the defendant's eyes. Regarding the defendant's alibi that he was in Alabama at the time the home invasion occurred, the jury heard the testimony of Ms. Thompson and Ms. Johnson and clearly rejected it, as was their prerogative.

Affording the State the strongest legitimate view of the evidence and deferring to the credibility determinations made by the jury, we conclude that the evidence supports the defendant's conviction of aggravated sexual battery.

## *II. Denial of Mistrial*

The defendant contends that the trial court erred by denying his motion for a mistrial. We disagree.

During the defendant's cross examination of S.U., the following exchange occurred:

| | |
|---|---|
| Defense Counsel: | Now, you say that you had never seen [the defendant] here before, except at the house. Have you not seen him – not seen anything of him in two months – or almost two months; is that right? |
| S.U.: | Before or after the robbery? |
| Defense Counsel: | After the robbery. |
| S.U.: | On TV. |
| Defense Counsel: | You had seen him on TV? I thought you testified you had not. Which is it, ma'am? |
| S.U.: | How ever long after it was that he shot that |

cop or – this was –

Trial Court:          Take the jury out just a second.

Once the jury had left the courtroom, defense counsel moved for a mistrial. After hearing brief argument from both sides, the trial court thoroughly questioned the defendant to ensure he understood that if a mistrial was granted, the case would merely be retried. The defendant confirmed his understanding. The trial court then denied the defendant's motion and brought the jury back into the courtroom, where the trial court instructed the jury as follows:

> I mentioned to you early this morning that you take a Constitutional oath to judge this case solely and alone on the law and the evidence. All of you agreed that you would – you would follow that rule.
>
> Sometimes during the course of a trial, the Court has to tell you to disregard statements that are made by witnesses or by counsel or by – disregard various evidence. And you are instructed you must do so.
>
> And I am going to tell you that the last answer that this witness gave was unresponsive to the question that was asked. It was unresponsive to the question that was asked. Had nothing to do with the question that [defense counsel] asked. You are to disregard her answer, disregard her answer, it has no place, no place in this trial. Can all of you follow that instruction?

Defense counsel then continued his cross examination of S.U.

The decision to grant or deny a mistrial is entrusted to the sound discretion of the trial court, and this court will disturb the trial court's ruling in this regard only when there has been an abuse of the trial court's discretion. *See State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003) (citing *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *Saylor*, 117 S.W.3d at 250 (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The burden of establishing the

necessity for mistrial lies with the party seeking it. *Id.*

Although Tennessee courts do not apply any exacting standard for determining when a mistrial is necessary after a witness has injected improper testimony, we have often considered (1) whether the improper testimony resulted from questioning by the State, rather than having been a gratuitous declaration, (2) the relative strength or weakness of the State's proof, and (3) whether the trial court promptly gave a curative instruction. *See State v. William Dotson*, No. 03C01-9803-CC-00105, slip op. at 9 (Tenn. Crim. App., Knoxville, June 4, 1999).

The defendant has failed to establish that the trial court abused its discretion by refusing to grant a mistrial. S.U. did not make her improper statement during direct examination by the State. Rather, the statement was made in response to questioning by defense counsel. As soon as the statement was made, the trial court excused the jury, apparently anticipating the defendant's objection. After denying the defendant's motion for a mistrial, the trial court issued a thorough curative instruction to the jury. The case against the defendant was strong, as previously discussed in our sufficiency analysis. Accordingly, the trial court's decision to deny the motion for a mistrial did not result in a miscarriage of justice. *See Saylor*, 117 S.W.3d at 250.

### III.  *Admission of Evidence*

The defendant next contends that the trial court erred by admitting photographs of the crime scene and of S.M.'s head injury, asserting that the photographs were irrelevant to the charged offense and were unfairly prejudicial. The defendant also argues that the trial court erred by allowing the State to introduce evidence of the defendant's guilty pleas to the other charged offenses in case 89645.

With respect to the photographs, the State attempted to admit numerous photographs depicting the damage to the Mortons' home due to the home invasion, as well as a single photograph of S.M. taken at the hospital depicting the head wound she sustained when one of the intruders struck her with a handgun. The defense objected, arguing that the photographs were irrelevant and unfairly prejudicial. In overruling the defendant's objection, the trial court stated as follows:

> The photographs don't show the location of the house, they
> show – that corroborates certain things that [S.M.] has said,
> plus, what other witnesses have said regarding (inaudible) and
> the injuries that she received. And although, they may not be
> pertinent to the (inaudible) sexual assault, but they do go to the

credibility of these witnesses, so I'm going to allow.

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. *See State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; *Banks*, 564 S.W.2d at 949. Next, the trial court must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951. Photographs offered by the State must be relevant to prove some part of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. *Id.* Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. *Banks*, 564 S.W.2d at 949; *see also State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); *State v. Allen*, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

The trial court determined that the photographs were relevant to corroborate the testimony of the witnesses. The photographs were not gruesome or inflammatory, and their probative value to corroborate witness testimony is not outweighed by the danger of unfair prejudice. Accordingly, we conclude that the trial court did not abuse its discretion by admitting the photographs.

Regarding the admission of the defendant's guilty pleas, the defendant has waived this issue by, first, failing to support his argument with citation to relevant authorities. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Second, the defendant has waived consideration of this issue because, although he did lodge a contemporaneous objection at trial, he failed to state any grounds for his objection. We gather that his objection referred to the motion in limine filed before trial, and although the record indicates that the motion in limine was denied, no transcript of the hearing on the motion was included in the record. The appellant bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), which includes the duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). If the appellant fails to file an adequate record, this court must presume the trial court's ruling was correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). In the absence of the motion in limine hearing transcript, we are without the facts upon which the trial court relied to make its ruling. Given this deficiency in the record, review of the trial court's decision to admit

the defendant's guilty pleas is impossible, and we must presume the trial court's ruling was correct.

## IV.  Sentencing

Finally, the defendant challenges the sentence imposed by the trial court, arguing that the trial court's application of an enhancement factor resulted in an excessive sentence and that the trial court should not have ordered consecutive service of the sentence. The State argues that the record supports the sentencing decision in this case.

### A.  Length of Sentence

The trial court imposed a sentence of 11 years, finding that the defendant "has a previous history of criminal convictions and criminal behavior in addition to those necessary to establish appropriate range." *See* T.C.A. § 40-35-114(1).  The court found no mitigating factors and relied on the single enhancement factor of prior criminal history in sentencing the defendant. On appeal, the defendant argues that the trial court's consideration of this enhancement factor was error because the criminal history relied upon by the trial court included only the crimes to which the defendant pleaded guilty in case 89645 and, as such, those convictions could not be considered as "previous history."

"[A]lthough the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act "effectively abrogated the de novo standard of appellate review." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).  Observing that a change in our standard of review was necessary to comport with the holdings of the United States Supreme Court, our supreme court "adopt[ed] an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.*

Despite the new standard of review, trial courts must still consider the principles of sentencing enumerated in Code section 40-35-210(b), *see Bise*, 380 S.W.3d at 698 n.33 (citing T.C.A. § 40-35-210(b)), 706 n.41, and must, as required by statute, consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5). The court cautioned that, despite the wide discretion afforded the trial court under the revised Sentencing Act, trial courts are "still required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* at 706 n.41 (citing T.C.A. § 40-35-210(e)).

In the instant case, although the trial court did not recite verbatim the principles of sentencing, the record as a whole reflects that the trial court considered all relevant sentencing principles, including the evidence presented at both trial and the sentencing hearing, the presentence report, the nature of the criminal conduct, and evidence of enhancement factors. As a Class B felony, the aggravated sexual battery conviction is sanctioned by a sentencing range of a minimum of eight years and a maximum of 12 years. *See* T.C.A. § 40-35-112(a)(2). The trial court stated that no mitigating factors were applicable and relied on the single enhancement factor of previous criminal history in sentencing the defendant to 11 years. The defendant's claim that the trial court only relied on the convictions arising from case 89645 in finding evidence of a previous criminal history is inaccurate. In addition to providing the trial court with certified copies of the defendant's prior felony convictions in case 89645, the State also provided certified copies of more than one dozen other convictions, including several felonies, arising out of multiple cases. Without question, this evidence constituted previous criminal history for the purpose of enhancing the defendant's sentence. As such, we conclude that the record supports the length of sentence imposed in this case.

### *B. Consecutive Sentencing*

In ordering consecutive sentencing, the trial court made the following findings:

> The Court also finds that based upon the Presentence Report in this case, that the defendant's history – criminal history is extensive. The Court has been convinced after hearing two or three hearings in this case, plus the proof in this case, that this defendant is a dangerous offender, who incarceration is necessary to protect the public interest and whose conduct serves little regard for public safety and health and risk of life – and for the safety of others. So these sentences will be run consecutive to the other counts in this Indictment.

When a defendant is convicted of multiple crimes, the trial court may order the sentence to be served consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115. They are:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). The existence of a single category is sufficient to warrant the imposition of consecutive sentences. *See State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), the supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used: the court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *Id.* at 937-39; *see State v. Imfeld*, 70 S.W.3d 698, 707-08 (Tenn. 2002).

In the instant case, the trial court based its decision to order consecutive sentencing on findings that the defendant had an extensive history of criminal activity and that the defendant was a dangerous offender. *See* T.C.A. § 40-35-115(b)(2), (4). Although the trial court failed to make the requisite *Wilkerson* findings in relying on the dangerous

offender category, the trial court's additional finding of an extensive criminal history, which, as previously discussed, is amply supported by the record, is "sufficient to warrant the imposition of consecutive sentences." *Adams*, 973 S.W.2d at 231. Accordingly, we find no error in the trial court's decision to impose consecutive sentencing.

*V. Conclusion*

The evidence is sufficient to support the defendant's conviction. The trial court did not err by denying the defendant's motion for mistrial or by admitting photographs of the crime scene and the injury to S.M. Based on the record provided to us, we find no error in the trial court's decision to admit into evidence the defendant's prior guilty pleas. The trial court did not err in sentencing the defendant. Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE