IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 12, 2015

**CYRUS RANDY WHITSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2005-D-3215     Mark Fishburn, Judge**

_____

**No. M2014-01941-CCA-R3-PC – Filed October 19, 2015**

_____

A Davidson County jury convicted the Petitioner, Cyrus Randy Whitson, of first degree murder. The Petitioner appealed, and this Court affirmed the conviction. *State of Tennessee v. Cyrus Randy Whitson*, No. M2007-02197-CCA-R3-CD, 2009 WL 3787457, at *1-3 (Tenn. Crim. App., at Nashville, Nov. 12, 2009) *perm. app. denied* (Tenn. April 23, 2010). Thereafter, the Petitioner timely filed a petition for post-conviction relief, and, after a hearing, the post-conviction court issued an order denying the petition. On appeal, the Petitioner maintains that he received the ineffective assistance of counsel. After a thorough review of the record and relevant law, we affirm the post-conviction court's judgment.

**Tenn. R. App. P 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Joshua L. Brand, Nashville, Tennessee, for the appellant, Cyrus Randy Whitson.

Herbert H. Slatery III, Attorney General and Reporter; Meredith Devault, Senior Counsel; Glenn R. Funk, District Attorney General; and Sarah Davis, Assistant District Attorney General, for the appellee, State of Tennessee

**OPINION**

**I. Facts**

A Davidson County jury convicted the Petitioner of the first degree murder of Eric Williams during the perpetration of a robbery. This Court summarized the facts presented at trial as follows:

In the early morning hours of December 2, 2004, the victim, Eric Williams, was shot and killed. At trial, Shawanna Bolden testified that she had known brothers Kim, Geatano, and [the Petitioner], for twelve years. On the night of the offense, Bolden was picked up in a van by Kim and Geatano at her aunt's house. They intended to take her to a bail bondsman because her boyfriend was in jail. Kim was driving and Geatano sat in the passenger seat. They stopped to pick up the [Petitioner] who sat in the back seat next to Bolden. Bolden testified that the [Petitioner] wore a black dress, pumps, and a hair weave. She noticed that the [Petitioner] had a small gun at his mid-section secured by his undergarments. Bolden said the [Petitioner] told her that the gun was for his protection.

After picking up the [Petitioner], Kim drove to a bar. Initially, only the [Petitioner] entered the bar; however, after several minutes, Kim, Geatano, and Bolden also went inside. Bolden said they were inside the bar for three or four minutes before they all returned to the van.

Upon leaving the bar, the [Petitioner] told Kim to stop at a motel, but did not say why he wanted to stop there. Kim parked at the back end of a motel, and the [Petitioner] got out of the van. Bolden said she was not able to see where the [Petitioner] went. After roughly one minute, Geatano and Kim left the van to check on the [Petitioner]. About twenty seconds later, the three brothers rushed back to the van. The brothers were arguing loudly, and Bolden described the [Petitioner] as "hysterical[.]" Bolden heard the [Petitioner] threaten to kill Geatano if he said anything about what happened. She said the [Petitioner] also stated, "Y'all better not say nothing, and that he would take his own charge." Bolden testified that Kim asked the [Petitioner], "Why did you kill him for?" She did not see any of the brothers with a gun. Before the brothers returned to the van, she heard something that sounded like a gunshot, but she was not certain.

After leaving the motel, the [Petitioner] was dropped off at his aunt's house. Bolden remained in the van while Kim drove to Geatano's apartment. Kim and Geatano went inside the apartment, and Bolden could hear the brothers "arguing and shouting for about ten or fifteen minutes." Kim returned to the van and drove Bolden to the restaurant where she worked.

The victim's girlfriend, Martha Bassham, testified that she called him several times after midnight on December 2, 2004, but he did not answer. Bassham called the facility where he worked, but she was told he

was not there. She had a friend take her to the motel where she said the victim had been living for between six and eight months. The victim's car was parked in front of his room. Bassham knocked on the victim's door, but he did not answer. A motel employee unlocked the door for Bassham. Upon entering, Bassham said she "could see [the victim's] head and his hands sticking out from behind the bed, he was laying face down on the floor." After determining the victim was dead, she left the room and called for help.

The detective who investigated the shooting testified that he found the victim laying face down on the floor next to his bed. The victim's hands were above his head, and a cigarette butt was next to his fingertips. A gunshot wound was on the back of the victim's head. The detective found no signs of a struggle or forced entry. The phone cord had been pulled from the wall and no weapons were found in the room. The police did not recover the murder weapon.

An officer with the technical investigation division also concluded that there was no evidence of forced entry. The officer found blood on the victim's hands, which he stated was spatter from a gunshot wound or aspirated blood. He determined that the victim's hands were close together when the blood stain developed. He found a pair of scissors outside of the victim's motel room.

A forensic pathologist performed the autopsy of the victim and concluded the victim died of a gunshot to the back of the head. The fatal wound was an inch and a half below the top of his head. She concluded that the bullet was fired from a small caliber gun within a couple of inches of the victim's skull. Based on the path of the bullet, her opinion was that the person who shot the victim was standing behind him. The forensic pathologist noticed a small abrasion or scratch on the victim's foot. She saw no other signs of physical injury to the victim's body.

Kim Whitson's attorney hired a private investigator who interviewed the [Petitioner] on January 13, 2006. The [Petitioner] did not give a recorded statement; however, the private investigator took notes from his discussion with the [Petitioner]. The State called the private investigator as a witness at the [Petitioner's] trial. Over the [Petitioner's] objection, the private investigator read his notes from his discussion with the [Petitioner] to the jury at trial. The [Petitioner] told the private investigator that he had gone to the motel to engage in prostitution and not to collect a debt. The [Petitioner] said he met the victim earlier in the day, and the victim asked if the [Petitioner] "dated." The [Petitioner] stated that the victim allowed him

3

to enter his motel room and stated that he would pay for sex. The [Petitioner] said he (the [Petitioner]) had a gun in his purse. Upon entering the motel room, the [Petitioner] saw that the victim had "a little gun with two barrels." The [Petitioner] stated that he had previously told the victim that he was a transvestite; however, the victim became angry when he discovered that the [Petitioner] was a man. The [Petitioner] said the victim dived at him and they "got to scrapping." The [Petitioner] explained that he was hitting the victim with a gun when it accidentally went off. Kim and Geatano then entered the room. The [Petitioner] said he was going to call the police but Kim pulled the phone out of the wall. The [Petitioner] sold the gun after the incident. From the private investigator's notes, it is unclear which gun, according to the [Petitioner], was fired and later sold. The [Petitioner] told the private investigator that he did not intend to kill the victim.

A firearms expert testified that it is possible for a gun to fire if dropped or hit against a hard object. The expert stated, however, that without a finger on the trigger, it is extremely unlikely for a gun to accidently go off, provided the gun had not been altered.

*State v. Cyrus Randy Whitson*, No. M2007-02197-CCA-R3-CD, 2009 WL 3787457, at *1-3 (Tenn. Crim. App., at Nashville, Nov. 12, 2009) *perm. app. denied* (Tenn. April 23, 2010). After hearing the evidence, the jury convicted the Petitioner of first degree murder, and the trial court sentenced him to life with the possibility of parole. The Petitioner appealed his conviction, which this Court affirmed. *Id*. at 1.

The Petitioner filed a timely post-conviction petition claiming that his attorney's, ("Counsel"), performance was deficient in several ways. As relevant to this appeal, the Petitioner asserted that Counsel failed to object to the introduction into evidence of the Petitioner's recorded statement to police and the notes of Rick Berry, failed to pursue a self-defense argument and a jury instruction for self-defense at trial, and failed to adequately communicate with the Petitioner regarding the trial proceedings. At the hearing, the post-conviction court admitted the trial transcript and the appellate record into evidence.

The Petitioner testified that he was forty-eight years old at the time of the post-conviction hearing. He stated that the trial court appointed Counsel to represent him and that Counsel visited with him two or three times in preparation for trial. The Petitioner stated that he only received "[p]arts" of discovery although he wrote two letters to Counsel requesting "the whole discovery." Counsel responded to the Petitioner's request indicating that the Petitioner did have all the discovery, and the Petitioner confirmed that he later found this to be true. In addition to the two or three meetings, the Petitioner said

that Counsel spoke with him on court dates but never discussed the evidence against him, weaknesses in the State's case, or possible defenses.

The Petitioner testified that he wrote Counsel a letter requesting that Counsel withdraw as his attorney. Counsel acknowledged receipt of the Petitioner's letter and his frustration, but Counsel never asked the trial court to be removed from the case. The Petitioner explained that he wanted Counsel to be removed as his attorney because Counsel "wasn't doing what he was supposed to do." The Petitioner said that Counsel failed to subpoena any of the witnesses the Petitioner requested and when the Petitioner asked Counsel to speak with the State about a possible probation sentence, Counsel said that a probation sentence was "unrealistic." The Petitioner stated that Counsel told him that he spoke with the witnesses, "Ms. Lymon and Katie Lawson" but that they were "not helpful." The Petitioner had no idea of the whereabouts of Ms. Lymon or Katie Lawson at the time of the hearing. The Petitioner claimed that Ms. Lymon would have testified that the Petitioner made up his statement to police to try and protect his brother.

The Petitioner testified that a recorded interview with him was played at trial. The Petitioner recalled the interview took place at Charles Bass Correctional Facility, but he had not listened to the recording before trial or discussed the interview with Counsel. He had no idea the recording was going to be played for the jury. The Petitioner acknowledged that Counsel successfully filed a motion in limine addressing the recorded statement but failed to request a mistrial when the recording was entered. The recording was entered into evidence through the testimony of Detective Robinson, who stated that the interview had taken place at the correctional facility. The Petitioner testified that he asked Counsel to seek a mistrial based upon Detective Robinson's testimony indicating the Petitioner's incarceration but that Counsel did not do so. The Petitioner stated that Detective Robinson mentioned the Petitioner's incarceration several times during his testimony. The Petitioner said that he did not recall Counsel conducting any cross-examination of Detective Robinson.

The Petitioner testified that Rick Berry, a witness at trial, was "a court appointed investigator" for Kim Whitson, the Petitioner's brother. Mr. Berry spoke with the Petitioner, in January 2006 before he was charged, as part of his investigation related to Kim Whitson's defense. The Petitioner recalled that the conversation was not recorded, so Mr. Berry read his notes of the conversation at trial. Counsel objected to the entry of the notes because he never received Mr. Berry's notes as part of discovery. The Petitioner stated that he was unaware that Mr. Berry would testify at trial because Mr. Berry was never listed as a witness. The Petitioner stated that Counsel failed to raise this issue in his motion for new trial, and it was not raised on direct appeal.

The Petitioner testified that he wrote a letter to Counsel stating that he "was covering for somebody else." He included a full statement and asked Counsel to give it to the prosecutor but could not recall "what happened" with respect to this admission and

instruction to Counsel. The Petitioner testified that the only discussion regarding self-defense was documented in a letter dated October 20, 2006. The letter stated, "I realize your position on any deal, but it is not realistic that the DA will give you probation in this case. We will have to win this one at trial, based on self-defense." The Petitioner could not recall whether Counsel argued self-defense at trial but was certain that a jury instruction on self-defense was not given. The Petitioner agreed that testimony regarding a struggle between the Petitioner and the victim was introduced through Rick Berry.

The Petitioner testified that he talked with Counsel on one occasion about his "[i]n-definitive type schizophrenia" diagnosis made in 2000. The Petitioner stated that he was taking Haldol, Cogentin, and Celexa as treatment for his mental illness. The Petitioner stated that the schizophrenia made it difficult for him to understand what was going on during the course of his case. The Petitioner told Counsel he was having "difficulty," but he was never evaluated for mental competence. The Petitioner stated that the issue of his competence was not raised on appeal.

On cross-examination, the Petitioner testified that Ms. Virginia Lymon was an alibi witness and would have testified that he was with her at the time of the murder. The Petitioner stated that he was never at the scene of the crime. He said that Katie Lawson was in the hotel room next door to the victim and stated that she heard fighting in the victim's room. The Petitioner testified that this would have proven that he was not there. He agreed that Ms. Lymon, Katie Lawson, and his brother were not present to testify at the post-conviction hearing explaining that he had not had time to "get anybody in here."

The Petitioner maintained that he was unaware of the State's witnesses, other than Shawanna Bolden and the police officers. He stated that Counsel never discussed with him his statement given to Detective Robinson or Shawanna Bolden's possible testimony. The Petitioner agreed that he had read copies of all the police reports but said that the police reports had "wrong, different numbers, and complaint numbers and stuff on them." The Petitioner said that Counsel and the trial judge told him he should not testify. The Petitioner agreed that he told the trial judge that he was "freely and voluntarily" choosing not to testify but that he did so because Counsel "recommended" that the Petitioner not testify.

The Petitioner testified that both his mental illness and his never having been through a jury trial contributed to his lack of understanding during the course of his case. He stated that he did not understand the trial or jury process because he had never been through a trial. About the jury's role in the case, he said that Counsel told him "self-defense, or going to find [you] guilty of involuntary manslaughter, which is fifteen years." Although the Petitioner stated that he had wanted Counsel to cross-examine Mr. Berry, he could not offer any questions that he wanted asked. Upon further questioning by the post-conviction court, the Petitioner explained that he agreed to help his brother, while believing that a jury would find the Petitioner acted in self-defense. He said that

6

the fact that he is gay provided motivation for the victim to have assaulted him and his need to protect himself. He maintained that he "had nothing to do with it. [He] was trying to cover for them."

Counsel testified that he had practiced law for the past fourteen years, and his area of practice was largely criminal defense. Counsel estimated that he met with the Petitioner in preparation for trial at least twelve times. During these meetings, the two discussed the State's proof. Counsel confirmed that the Petitioner had a copy of the discovery, which included all of the police reports and witness statements. The Petitioner never expressed any difficulty in reading or understanding the discovery. In fact, the Petitioner had comments about some of the records that indicated to Counsel that the Petitioner understood the materials.

Counsel testified that he discussed with the Petitioner that Shawanna Boldnen's testimony would likely be the "biggest testimony against him." Counsel also discussed with the Petitioner that the Petitioner's statement would be admitted at trial and Mr. Berry's possible testimony. Counsel identified a notice received six months before trial indicating that Mr. Berry was a potential witness for the trial but stated that he had discussed the Petitioner's statement to Mr. Berry before he received the notice. Counsel recalled that initially the Petitioner told Counsel that he was "covering up" for his brother. As the discovery began to indicate otherwise, the Petitioner told Counsel that the victim pulled a gun on the Petitioner and the gun fired accidentally when the Petitioner was attempting to flee from the victim. As he discussed possible defenses with the Petitioner, the two decided to pursue the defense theory that the shooting was an accident.

Counsel testified that the Petitioner asked him to speak with Virginia Lymon and Katie Lawson as possible alibi witnesses. Counsel sent an investigator to speak with both witnesses, and neither witness could provide an alibi for the timeframe of the murder. He stated that the Petitioner never asked him to argue that he was not present at the location of the shooting. Counsel recalled talking with the Petitioner about testifying, and the Petitioner decided "long before trial" that it would not be "a good idea" to testify.

Counsel testified that he considered ways to exclude the recorded statement to Detective Robinson but determined it was admissible. He agreed that he filed a motion in limine regarding Detective Robinson, but the motion addressed recorded jail telephone calls that occurred just prior to trial and not the Petitioner's recorded statement to police. The telephone recordings were not played at trial. Counsel agreed that, at trial, Detective Robinson twice mentioned that the Petitioner was in jail at the time of the interview. Counsel objected but did not seek a mistrial. He explained that he did not do so because he did not believe it was "enough of error" to warrant relief based upon his past experience with the court finding the mention of incarceration "harmless error."

7

Counsel testified that the Petitioner told him he had "mental health instability a few years prior to this incident" but never provided Counsel with any records. Nothing in his interaction with the Petitioner suggested the Petitioner was not competent to stand trial. Counsel described the Petitioner as participating in the process and stated he believed the Petitioner understood the charges "without a doubt."

Counsel testified that he did not object to Mr. Berry reading his notes at trial because the notes reflected statements that were consistent with the defense theory of the case. He believed the notes, as written, would be more beneficial than Mr. Berry testifying from memory.

In a written order, the post-conviction court made the following findings:

> The court does not find any merit in the failure by trial counsel to contest the admission of [the] Petitioner's recorded statement, nor does [the Petitioner] give any specific basis for contesting the statement. He does not allege a *Miranda* violation or any threats or coercion being used. There does not appear to be any procedural difference with this interview compared with the other two. What is different is that the Petitioner gave statements against interest in the recorded statement whereas he did not in the others. This issue is without merit.

> The explanation given by [Counsel] for not seeking a mistrial after the jury heard that the [Petitioner] was incarcerated was that he did not feel that the circumstances supported the granting of one. First, a mistrial should only be granted "upon a showing of manifest necessity[.]" *State v. Saylor*, 117 S.W.3d 239, 250-51 (Tenn. 2003). Manifest necessity exists when the damage done to the judicial process by some event is such that an impartial verdict is precluded. *State v. Williams*, 929 S.W.[2d] 385, 388 (Tenn. Crim. App. 1996). A prompt curative instruction about a defendant's incarceration generally is adequate in lieu of granting a mistrial. See e.g. *State v. Hall*, 947 S.W.2d 181, 184 (Tenn. Crim. App. 1997). Here, the court would not have granted the mistrial if sought. The evidence of [the] Petitioner's guilt was fairly substantial. Also, jurors are not totally naïve as to the criminal justice system. Surely it came as no shocking surprise that an individual on trial for murder may be in jail. The court simply does not find that the referenced incarceration was of much consequence. This issue is without merit.

> [The] Petitioner claims that his right to have appellate review of the admission of the private investigator's interview of him was waived because trial counsel cited the wrong legal basis to challenge its

admissibility at trial. Further, the issue was not raised in the motion for new trial. [The] Petitioner argues that the interview was particularly harmful because it placed him at the scene. [Counsel] counters that it was a tactical decision to allow admission of the testimony because it put before the jury the defense position that the shooting was an accident without having to put the [Petitioner] on the stand. This issue is without merit for several reasons. First, the testimony was admissible even if the objection had been based on hearsay. Clearly the statement was against interest and, therefore, was admissible as an exception to the hearsay rule. Tenn. R. Evid. 803(1.2). Second, a reasonably based trial tactic will not be second guessed in hindsight if it was made after adequate preparation. *State v. Adkins*, 911 S.W.2d 334, 347 (Tenn. 1994). The court finds [Counsel] properly prepared for trial and that there was good reason not to contest the admissibility of the interview i.e. [to] get before the jury, without the [Petitioner] testifying, [the Petitioner's] version of the events.

The decision not to seek a jury instruction on self-defense was again a trial tactic employed by [Counsel]. The decision had been made by him early in the development of the case despite [the Petitioner], at one point, claiming it was self-defense. The court finds that [Counsel] had a reasonable basis to make this tactical decision. First, there was no evidence that the victim had a weapon other than the general allegation by [the Petitioner]. Second, there was minimal evidence of any real struggle in the motel room. Third, and most importantly, the victim was shot in the back of the head. This issue is without merit.

[The Petitioner] also complains that [Counsel] did not call the witnesses whose names he provided that would establish for [the] Petitioner an alibi or possibly a self-defense. First of all, [Counsel] did talk to two (2) of the witnesses and they did not corroborate the claims of [the Petitioner]. The court accredits the testimony of [Counsel] in this regard. Second, anyone would have to be suspect of his client if he tendered to you witnesses to support both an alibi defense and self-defense. Third, generally a Petitioner who claims ineffective assistance of counsel based on failure to call a witness must bring in that witness to testify at the post conviction hearing for it is not the trial court's prerogative to speculate as to what the witness would say. *State v. Black*, 794 S.W.2d 752, 758 (Tenn. Crim. App. 1990).

The Petitioner's claim that counsel failed to adequately communicate with him is simply specious at best. Instead, the court accepts that the parties met 12-14 times total and all aspects of the case were fully discussed. The fact that [the Petitioner] did not agree with all of

the tactical decisions made by [Counsel] is of no consequence if based on reasonable grounds after adequate preparation, which the court has already concluded occurred.

. . . .

For all the foregoing reasons, the Petition for Post-Conviction Relief is hereby respectfully denied.

(Footnote omitted). It is from this judgment that the Petitioner appeals.

## II. Analysis

The Petitioner asserts that he received the ineffective assistance of counsel. Specifically, he claims that Counsel: (1) did not object to or seek a mistrial for the admission of the Petitioner's recorded statement to Detective Robinson; (2) did not seek a mistrial after a witness referenced the Petitioner's incarceration; (3) did not object to Mr. Berry reading from his notes and failing to preserve the issue for appeal; (4) failed to seek a jury instruction on self-defense; and (5) failed to adequately communicate with the Petitioner. The State responds that the Petitioner has failed to show that he received deficient legal assistance or suffered any prejudice due to the representation. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6

S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy

and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad,* 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In the case under submission, the evidence does not preponderate against the post-conviction court's findings. Counsel met with the Petitioner numerous times to discuss the State's evidence, review discovery, and discuss trial strategy. Counsel pursued potential witnesses but found their statements failed to establish an alibi defense. As the discovery evidence developed, Counsel and the Petitioner decided to pursue the theory that the firing of the gun that killed the victim was an accident. The Petitioner participated in a recorded statement to police that was admitted at trial. Counsel looked for avenues for suppression but found no basis to exclude the recording; however, we note Counsel did successfully exclude recorded jail telephone conversations involving the Petitioner. Detective Robinson twice mentioned the Petitioner's incarceration and Counsel objected on one occasion but did not seek a mistrial based on prior experience. Counsel made a tactical decision not to object to Mr. Berry reading his notes at trial because Counsel knew that the contents of the notes supported the defense theory. The Petitioner has not proven by clear and convincing evidence that Counsel was ineffective in his representation.

As the post-conviction court noted, it appears the Petitioner primarily challenges Counsel's tactical decisions. Our review of the record reveals that Counsel's decisions with regard to trial strategy and tactical choices were informed and based upon adequate preparation. *See House*, 44 S.W.3d at 515. Accordingly, the Petitioner has failed to show by clear and convincing evidence that Counsel was deficient or that the deficiency prejudiced the defense. The Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied the Petitioner post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

12